**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 27 1998**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

TOM SNYDER,

      Plaintiff - Appellant,

v.

MURRAY CITY CORPORATION, a
municipal corporation; H. CRAIG
HALL, City Attorney for Murray City
Corporation,

      Defendants - Appellees.

---

UNITED STATES OF AMERICA,

      Intervenor.[1]

No. 96-4087

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 94-CV-667)**

---

Brian M. Barnard (Andrea Garland of the Utah Legal Clinic, with him on the
briefs), Cooperating Attorneys for Utah Civil Rights & Liberties Foundation, Inc.,

---

[1]The government intervened in this case in the district court solely for the
purpose of defending the constitutionality of the Religious Freedom Restoration
Act of 1993. The government did not participate in the initial appeal of this case
and did not participate in this en banc rehearing. Thus, although the government
remains named in the caption of this case, it is not a party to the appeal.

Salt Lake City, Utah, for Plaintiff-Appellant.

Allan L. Larson (Richard A. Van Wagoner, with him on the brief) of Snow, Christensen & Martineau, Salt Lake City, Utah, for Defendants-Appellees.

---

Before **SEYMOUR**, Chief Judge, **HOLLOWAY**, Senior Circuit Judge, **PORFILIO**, **ANDERSON**, **TACHA**, **BALDOCK**, **BRORBY**, **EBEL**, **KELLY**, **HENRY**, **BRISCOE**, **LUCERO**, and **MURPHY**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

This court has agreed to rehear this case en banc[2] to consider whether the Establishment Clause of the First Amendment prevents a city council from denying a request from a private citizen to give a prayer at the opening of the council's meeting when the denial is made on the basis of the content of the proposed prayer. The Supreme Court of the United States has previously held in Marsh v. Chambers, 463 U.S. 783 (1983), that the United States Constitution is not violated if a legislative or other deliberative body chooses to speak prayerfully when it opens its meetings. Applying Marsh, we now hold that no violation of the Establishment Clause arises when a city chooses who may offer

---

[2]The original panel in this case voted to affirm in part and reverse in part the district court's order. See Snyder v. Murray City Corp., 124 F.3d 1349 (10th Cir. 1997). This court granted the appellant's petition for rehearing en banc limited to the Establishment Clause issues presented in the case. We now vacate Part I.B. of the panel's opinion. We did not grant rehearing as to the other portions of the panel decision, and consequently, the remainder of the panel opinion remains in effect.

the invocational prayer to open a city council meeting.

## Background

The background of this case is reported in the district court and original panel opinions, see Snyder v. Murray City Corp. 902 F. Supp. 1444 (D. Utah 1995) ["Snyder I"] and Snyder v. Murray City Corp., 902 F. Supp. 1455 (D. Utah 1995) ["Snyder II"], aff'd in part & rev'd in part, Snyder v. Murray City Corp., 124 F.3d 1349 (10th Cir. 1997) ["Snyder III"].  We provide only those details that are germane to the Establishment Clause issue that we deal with here.

In 1993, the Utah Supreme Court held that the religion clauses of Utah's state constitution do not prohibit a city council from opening its meetings with a prayer.  See Society of Separationists, Inc. v. Whitehead, 870 P.2d 916 (Utah 1993).  In the wake of that decision, the municipal council of Murray City resumed a practice it had maintained since 1982 – but suspended during the pendency of the appeal in Separationists – of opening each of its meetings with a prayer.  Those prayers had been offered by members of the religious communities in and around Murray City, including various members of Judeo-Christian congregations, Zen Buddhists, and Native Americans.  Each of those offering prayers during Murray City's council meetings did so at the initial request of the City Council, usually in response to a form letter the council circulated to local

religious communities. Prior to the events at issue in this case, the city had never received an unsolicited request from a private individual to give a prayer at a council meeting. In light of this historical practice, Murray City had no written policy on its council prayers, and it had no formal guidelines for the content of its council prayers.

The decision in Separationists, and the ensuing resumption of legislative prayers by city councils throughout Utah, prompted Tom Snyder, plaintiff-appellant here, to draft a prayer that calls on public officials to cease the practice of using religion in public affairs.[3] Although Snyder's putative prayer is unusual

---

[3]The text of Snyder's proposed prayer is as follows:

OPENING PRAYER
OUR MOTHER, who art in heaven (if, indeed there is a heaven and if there is a god that takes a woman's form) hallowed be thy name, we ask for thy blessing for and guidance of those that will participate in this meeting and for those mortals that govern the state of Utah;

We fervently ask that you guide the leaders of this city, Salt Lake County and the state of Utah so that they may see the wisdom of separating church and state and so that they will never again perform demeaning religious ceremonies as part of official government functions;

We pray that you prevent self-righteous politicians from mis-using the name of God in conducting government meetings; and, that you lead them away from the hypocritical and blasphemous deception of the public, attempting to make the people believe that

(continued...)

and iconoclastic, because this case was decided on summary judgment we will

assume without deciding that it is an invocational prayer.[4]  See Engel v. Vitale,

---

[3](...continued)
bureaucrats' decisions and actions have thy stamp of approval if prayers are offered at the beginning of government meetings;

We ask that you grant Utah's leaders and politicians enough courage and discernment to understand that religion is a private matter between every individual and his or her deity; we beseech thee to educate government leaders that religious beliefs should not be broadcast and revealed for the purpose of impressing others; we pray that you strike down those that mis-use your name and those that cheapen the institution of prayer by using it for their own selfish political gains;

We ask that the people of the state of Utah will some day learn the wisdom of the separation of church and state; we ask that you will teach the people of Utah that government should not participate in religion; we pray that you smite those government officials that would attempt to censor or control prayers made by anyone to you or to any other of our gods;

We ask that you deliver us from the evil of forced religious worship now sought to be imposed upon the people of the state of Utah by the actions of mis-guided, weak and stupid politicians, who abuse power in their own self-righteousness;

All of this we ask in thy name and in the name of thy son (if in fact you had a son that visited Earth) for the eternal betterment of all of us who populate the great state of Utah.
Amen.

[4]Snyder's supplications draw on religious tenets held by many.  See Matthew 6:5; Book of Mormon, 3 Nephi 13:6.  Although there is admittedly some contradictory evidence in the record, Snyder has presented sufficient evidence to

(continued...)

370 U.S. 421, 424 (1962) (noting that a "solemn avowal of divine faith and supplication for the blessings of the Almighty" is a "prayer" with an explicitly religious character); Karen B. v. Treen, 653 F.2d 897, 901 (5th Cir. Unit A Aug.1981) ("Prayer is an address of entreaty, supplication, praise, or thanksgiving directed to some sacred or divine spirit, being, or object."). Although Snyder's supposed prayer can perhaps as easily be characterized as political harangue, the political aspect of a religious supplication does not necessarily invalidate the invocation's prayerful character. See Karen B., 653 F.2d at 901 ("That [a prayer] may contemplate some wholly secular objective cannot alter the inherently religious character of the exercise."). Nevertheless, the Establishment Clause speaks only to the religious aspect of Snyder's prayer, which we presume for purposes of this appeal, and as a result, we are not called in this case to evaluate the prayer's political overtones. By assuming the religious content of Snyder's prayer, we expressly reserve for another day the very difficult issue of attempting

---

[4](...continued)
create a genuine dispute of fact as to the sincerity of his religious belief that prayer should be a private matter and should not be used to self-aggrandize the prayer-giver.

Nevertheless, if Snyder's invocation is not a "prayer," our ultimate conclusion that Murray City did not violate the Establishment Clause would remain the same. If Snyder's speech is a non-prayer, then for the reasons we discuss below in Part III, there would be no "impermissible motive" in preventing Snyder from reciting a non-prayer during a time permissibly reserved for legislative prayer. Thus, there would be no Establishment Clause violation. See Part III, infra.

to discern the line between prayer and secular speech masquerading as prayer.

Snyder first presented this prayer, and his request to recite it, to the city council in Salt Lake City, prompting media coverage of the proposed prayer including publication of extensive excerpts. See, e.g., Jon Ure, S.L. Man Wants to Ask Mother in Heaven to End Public Prayer, Salt Lake Trib., Jan. 19, 1994, at B1. Rather than allowing Snyder to recite the prayer, officials in Salt Lake City decided to discontinue that city's practice of opening their city council meetings with a prayer.

Snyder next contacted officials in Murray City with a letter on March 23, 1994, expressing his interest in presenting a prayer at one of the council's upcoming meetings and asking for information on guidelines for such prayers and how a person is selected to give such prayers. This letter gave no hint as to the text of Snyder's proposed prayer. When Snyder received no response to his first letter, he sent a second letter on May 9, 1994, again expressing interest in giving a prayer at a city council meeting. This second letter again included no mention of the text of his proposed prayer.

On June 1, 1994, City Attorney H. Craig Hall responded to Snyder's letters by explaining that the city council had established an explicit policy that "all council meetings will start with prayer," but the council had not established "formal policies regarding the nature and/or content of this reverence portion of

their agenda." Hall's letter continued:

> The purpose of the "prayer" is to allow
> individuals that opportunity to express thoughts, leave
> blessings, etc. It is not a time to express political views,
> attack city policies or practices or mock city practices or
> policies.
> Comments on present city practices or policies
> may be made at city council meetings by one of two
> methods; either by requesting to be placed on the
> agenda, or, taking up to three minutes during the
> "citizen comment" portion of the meeting. The later
> [sic] method requires no prior arrangements to be made.[5]

Nowhere in his June 1 letter did Hall respond to Snyder's particular request for

permission to give a prayer at a city council meeting.

On June 9, 1994, Snyder sent a third letter to Murray City, again repeating

his request for permission to give a prayer at a city council meeting and this time

including a copy of the text of his proposed prayer.

Three weeks later, Hall responded to Snyder's third letter, this time

explicitly denying permission for Snyder to give a prayer at a city council

meeting:

> The text of the proposed prayer is unacceptable.
> It does not follow the guidelines set forth in my letter

---

[5]The text of this letter, with its references to attacks on city policies, suggests that City Attorney Hall already was aware of the general tenor of Snyder's proposed prayer even though Snyder had not yet included a copy of it in his letters to Murray City. At a later deposition in this case, Hall conceded that he was influenced by media coverage of Snyder's dealings with the Salt Lake City council when he wrote the June 1, 1994, letter.

dated June 1, 1994.  Until your proposed prayer satisfies these guidelines, an invitation to participate in our opening ceremonies will not be forthcoming.

Snyder received Hall's denial letter on July 1, 1994, and filed the original complaint in this case the same day.

Snyder's subsequently amended complaint sought compensatory and punitive damages, as well as injunctive and declaratory relief, on the basis of Murray City's alleged violations of Snyder's First Amendment and procedural due process rights under the United States Constitution and the Utah Constitution, as well as his rights under the Religious Freedom Restoration Act of 1993. Following discovery and cross-motions for summary judgment, the district court ruled against all of Snyder's claims.  See Snyder I, 902 F. Supp. at 1455 (granting summary judgment to Murray City); Snyder II, 902 F. Supp. at 1458 (denying Snyder's motion for new trial).  On appeal, a divided panel of this court affirmed the district court's resolution of Snyder's federal claims but instructed the district court to dismiss, without prejudice, Snyder's state-law claims for want of adequate supplemental jurisdiction.  See Snyder III, 124 F.3d at 1353-55.  This court subsequently agreed to rehear only Snyder's federal Establishment Clause claim en banc.[6]

---

[6]The order for rehearing en banc initially specified two questions for the parties to address.  This court, however, subsequently modified that order to

(continued...)

**Discussion**[7]

The very first command of our Bill of Rights, as it applies to the states through the Fourteenth Amendment, is that state and local governments "shall make no law respecting an establishment of religion." U.S. Const., amend. I, cl. 1. At its core, the Establishment Clause enshrines the principle that government may not act in ways that "aid one religion, aid all religions, or prefer one religion over another." See Lee v. Weisman, 505 U.S. 577, 600 (1992) (Blackmun, J., concurring). As Justice Black declared for the Supreme Court more than fifty years ago, "Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa." Everson v. Board of Educ., 330 U.S. 1, 16 (1947). This core understanding of our notion of religious liberty stretches back to the very genesis of the First Amendment. See Reynolds v. United States, 98 U.S. (7 Otto.) 145, 164 (1878) (discussing the history of the Establishment Clause and quoting Jefferson's letter to the Danbury Baptist Association on the purpose of the clause

---

[6](...continued)
delete the specific questions presented and "clarify that rehearing en banc is granted on the Establishment Clause issues in this case."

[7]In light of the First Amendment issue raised in this appeal and our consequential "'obligation to make an independent examination of the whole record,'" we review the district court's summary judgment decision de novo. See Lytle v. City of Haysville, Kansas, 138 F.3d 857, 862 (10th Cir. 1998) (quoting Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 499 (1984)).

to "build[] a wall of separation between church and State").

Although there are many kinds of Establishment Clause claims, the prayer cases typically arise in a procedural posture that pits an audience member of a particular faith, often a minority religious view, against a government-sanctioned speaker who has recited a prayer, often expressing a majoritarian religious view, during a government-created prayer opportunity. See, e.g., Lee, 505 U.S. at 581 (involving a student's challenge to a public school graduation prayer prepared by a local rabbi in compliance with school district guidelines developed by the National Conference of Christians and Jews); Chaudhuri v. Tennessee, 130 F.3d 232, 233-34 (6th Cir. 1997) (involving a Hindu professor's challenge to a public university's practice of beginning university events and faculty meetings with prayers), cert. denied, 118 S. Ct. 1308 (1998); see also Bauchman v. West High Sch., 132 F.3d 542, 546 (10th Cir. 1997) (involving a Jewish student's challenge to a Mormon music teacher's various practices and selection of allegedly religious music for a high school choir in Salt Lake City), cert. denied, 118 S. Ct. 2370 (1998).

The difficulty of the establishment claim in this case flows partly from its inversion of the usual posture. Here, the plaintiff is the putative government-sanctioned speaker, and he alleges that in preventing him from reciting his prayer against government prayers, the government has established a religion. Despite

its unusual posture, the essence of Snyder's contention is straight-forward: Snyder claims that in branding his particular prayer "unacceptable" and preventing him from offering it as part of the official "reverence period" of the municipal council meeting, Murray City has impermissibly preferred one religion over another. We must decide if that is so.

## I. Sui generis status of legislative prayers

Prior to 1983, the lower courts had reached a consensus, but without any consistent rationale, on the conundrum of whether overtly religious prayers by local and state legislative bodies in opening their legislative sessions constituted the kind of religious activity banned by the Establishment Clause. With varying reasoning, the lower courts agreed that such legislative prayers did not fall within the prohibition against a "law respecting an establishment of religion." See Bogen v. Doty, 598 F.2d 1110, 1113-14 (8th Cir. 1979) (applying the three-part test of Lemon v. Kurtzman, 403 U.S. 602 (1971), in upholding a county board's practice of invocational prayers because they had a "clearly secular purpose," but warning that the county's selection procedures for who should give such prayers were dangerously close to the "quagmire" of "excessive entanglement" and that the board would be in a "difficult position" if it rejected a volunteer because of his or her religious persuasion); Colo v. Treasurer & Receiver General, 392

N.E.2d 1195, 1199-1200 (Mass. 1979) (upholding the state's practice of paying legislative chaplains in large part because of the practice's long history and tradition and because it did not present substantial "divisive political potential"); Marsa v. Wernik, 430 A.2d 888, 895-96 (N.J.) (upholding invocational prayers at a borough council meeting because the religious dimension of the prayers did not predominate over secular goals, nor was the primary effect of the prayer to promote or inhibit religion), cert. denied, 454 U.S. 958 (1981); Lincoln v. Page, 241 A.2d 799, 800-01 (N.H. 1968) (upholding a town's practice of invocational prayers at each annual town meeting because of a de minimis religious effect, historic use, and similarity to religious references on coins, currency, public buildings and plaques).

In 1983, however, the Supreme Court swept away the various approaches with its pathmarking decision in Marsh v. Chambers, 463 U.S. 783 (1983). Noting that "[t]he opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country," the Court held that "[t]his unique history leads us to accept the interpretation of the First Amendment draftsmen who saw no real threat to the Establishment Clause arising from a practice of prayer [opening a legislative session]." Marsh, 463 U.S. at 786, 791. In the course of reaching this holding, the Court surveyed the historical record of the views of the framers of the

Constitution as well as the practices of the early Congresses and the infant state legislatures. The Court concluded, "Clearly the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of that Amendment, for the practice of opening sessions with prayer has continued without interruption ever since that early session of Congress." Id. at 788.

Although the Court relied solely – and to the exclusion of its traditional establishment tests – on a historical analysis to justify the practice of legislative prayers in Marsh,[8] since that decision the Court has repeatedly avoided applying Marsh's mode of historical analysis. See, e.g., County of Allegheny v. American Civil Liberties Union, 492 U.S. 573, 603 (1989) (rejecting the dissenting argument in Allegheny County that the Marsh historical analysis controlled the constitutionality of traditional crèche displays at Christmas: "However history may affect the constitutionality of nonsectarian references to religion by the

---

[8]The historical analysis that formed the basis of Chief Justice Burger's majority opinion in Marsh has tempted many litigants and some courts to argue that the Supreme Court in Marsh created a whole new mode of analysis for Establishment Clause claims generally. See, e.g., Stein v. Plainwell Community Schs., 822 F.2d 1406, 1409-10 (6th Cir. 1987) (holding that Marsh's reliance on historical acceptance controlled the court's holding that nonsectarian, nondenominational school graduation prayers are constitutional). But see Lee, 505 U.S. at 589, 596-97 (rejecting the view in Stein that school graduation prayers could be justified by their historical acceptance and stressing again the limited nature of its ruling in Marsh permitting invocational legislative prayers).

government, history cannot legitimate practices that demonstrate the government's allegiance to a particular sect or creed.") Instead, the evolution of Establishment Clause jurisprudence indicates that the constitutionality of legislative prayers is a sui generis legal question. As Justice Brennan noted in his dissent in Marsh, the kind of legislative prayers at issue in Marsh simply would not have survived the traditional Establishment Clause tests that the Court had relied on prior to Marsh and has continued to rely on in different contexts since Marsh. See Marsh, 463 U.S. at 796 (Brennan, J., dissenting). For this reason, the mainline body of Establishment Clause case law provides little guidance for our decision in this case. Our decision, instead, depends on our interpretation of the holding in Marsh.

In describing its conclusion that legislative prayers do not violate the First Amendment, the Marsh Court approached the question first and foremost as a facial issue, separate from the particular nuances of the Nebraska practice there under review. The Court made clear that it was considering legislative prayers as a kind of religious genre, and it was this particular genre that was unvitiated by the Establishment Clause:

> In light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society. To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an

- 15 -

> "establishment" of religion or a step toward
> establishment; it is simply a tolerable acknowledgment
> of beliefs widely held among the people of this country.

Id. at 792. This religious genre known as "legislative prayer" includes the traditional kind of invocational legislative prayers with which the Court was familiar, as well as similarly traditional governmental invocations such as the cry, "God save the United States and this Honorable Court," intoned by the Court's bailiff at the beginning of its own sessions.[9] See id. at 786. As Justice O'Connor later explained, these kinds of "government acknowledgments of religion serve, in the only ways reasonably possible in our culture, the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society." Lynch v. Donnelly, 465 U.S. 668, 693 (1984) (O'Connor, J., concurring). In Lynch, the majority observed that the Establishment Clause cannot mechanistically be applied to draw unwavering, universal lines for all of the varying contexts of public life. Rather, the clause erects a "'blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship.'" Id. at 679 (quoting Lemon v. Kurtzman, 403 U.S. 602, 614 (1971)). The Court noted that "[i]t would be difficult to identify a more striking example of the accommodation

---

[9]This judicial invocational prayer also was recited prior to the oral arguments in this very case.

of religious belief intended by the Framers [than legislative invocational prayer]." Id. at 674.

We are obliged, therefore, to read Marsh as establishing the constitutional principle that the genre of government religious activity that has come down to us over 200 years of history and which we now call "legislative prayer" does not violate the Establishment Clause. Furthermore, as a consequence of the fact that this genre of government religious activity cannot exist without the government actually selecting someone to offer such prayers, the decision in Marsh also must be read as establishing the constitutional principle that a legislative body does not violate the Establishment Clause when it chooses a particular person to give its invocational prayers. Similarly, there can be no Establishment Clause violation merely in the fact that a legislative body chooses not to appoint a certain person to give its prayers. The act of choosing one person necessarily is an act of excluding others, and as a result, if Marsh allows a legislative body to select a speaker for its invocational prayers, then it also allows the legislative body to exclude other speakers.

## II. Constitutional limits on legislative prayers

Snyder argues that even if Marsh allows legislative prayers, that case imposes some limits on a legislative body's discretion to appoint or to exclude the

persons who will recite its prayers.  Snyder points out that when the Court turned to the particular nuances of the Nebraska practice in <u>Marsh</u>, the Court gave only conditional approval to the legislative chaplain system there.  <u>See Marsh</u>, 463 U.S. at 793-95.  Snyder argues that in light of those conditions in <u>Marsh</u>, Murray City may not discriminate against his request to give an opening prayer based on the content of his proposed prayer.

Although we agree with Snyder that <u>Marsh</u> implicitly acknowledges some constitutional limits on the scope and selection of legislative prayers, those limits are not the ones Snyder would have us adopt.  The Establishment Clause and <u>Marsh</u> simply do not require that a legislative body ensure a kind of equal public access to a legislative body's program of invocational prayers.  Instead, the constitutional restraints on legislative prayers flow directly from the scope of the religious genre blessed in <u>Marsh</u>.  What matters under <u>Marsh</u> is whether the prayer to be offered fits within the genre of legislative invocational prayer that "has become part of the fabric of our society" and constitutes a "tolerable acknowledgment of beliefs widely held among the people."  <u>See id.</u> at 792.

The point at which an invocational legislative prayer falls outside the traditions of the genre and becomes intolerable occurs when "the prayer opportunity has been exploited to proselytize or advance any one, or to disparage

any other, faith or belief."[10]  See id. at 794-95; see also Coles v. Cleveland Bd. of Educ., 950 F. Supp. 1337, 1347 (N.D. Ohio 1996) (relying on Marsh to uphold a school board's practice of invocational prayer because "the record does not support a finding that the board was using prayer as an attempt to convert audience members or to promote any particular belief"); Bacus v. Palo Verde Unified Sch. Dist. Bd. of Educ., 11 F. Supp. 2d 1192 (C.D. Cal. 1998) (denying a request for a preliminary injunction against a school board's practice of invocational prayer in light of Marsh).  As Marsh indicated, the danger is not just an effort to proselytize or disparage an entire religion, but also efforts to proselytize or disparage the particular tenets or beliefs of individual faiths.  See

_____

[10]Of course, all prayers "advance" a particular faith or belief in one way or another.  The act of praying to a supreme power assumes the existence of that supreme power.   Nevertheless, the context of the decision in Marsh – in which the Court considered the constitutionality of a Presbyterian minister's "Judeo Christian," "nonsectarian" invocations for the Nebraska Legislature – underscores the conclusion that the mere fact a prayer evokes a particular concept of God is not enough to run afoul of the Establishment Clause.

Rather, what is prohibited by the clause is a more aggressive form of advancement, i.e., proselytization.  See Marsh, 463 U.S. at 793 n.14, 794-95.  By using the term "proselytize," the Court indicated that the real danger in this area is effort by the government to convert citizens to particular sectarian views.  See Websters Third New International Dictionary (Unabridged) 1826 (1986) (defining "proselytize" as "to convert from one religion, belief, opinion, or party to another").  As the Court reiterated in Lee, "[I]n the hands of government what might begin as a tolerant expression of religious views may end in a policy to indoctrinate and coerce.  A state-created orthodoxy puts at grave risk that freedom of belief and conscience which are the sole assurance that religious faith is real, not imposed." Lee, 505 U.S. at 591-92.

- 19 -

Marsh, 463 U.S. at 794-95.  The Court explained six years after Marsh that "not even the 'unique history' of legislative prayer can justify contemporary legislative prayers that have the effect of affiliating the government with any one specific faith or belief."  See Allegheny County, 492 U.S. at 603 (quoting Marsh, 463 U.S. at 791).  Thus, the kind of legislative prayer that will run afoul of the Constitution is one that proselytizes a particular religious tenet or belief, or that aggressively advocates a specific religious creed, or that derogates another religious faith or doctrine.  When a legislative invocation strays across this line of proselytization or disparagement, the Establishment Clause condemns it.

As a second constitutional restriction on legislative prayer, the Court in Marsh also warned that the selection of the person who is to recite the legislative body's invocational prayer might itself violate the Establishment Clause if the selection "stemmed from an impermissible motive."  See Marsh, 463 U.S. at 793.  The Court implicitly indicated that the particular motive that is "impermissible" in this context is a motive in selecting the prayer-giver either to "proselytize" a particular faith or to "disparage" another faith, or to establish a particular religion as the sanctioned or official religion of the legislative body.  See id. at 793-95.

It is clear under Marsh that there is no "impermissible motive" when a legislative body or its agent chooses to reject a government-sanctioned speaker because the tendered prayer falls outside the long-accepted genre of legislative

prayer. The genre approved in <u>Marsh</u> is a kind of ecumenical activity that seeks

to bind peoples of varying faiths together in a common purpose. That genre,

although often taking the form of invocations that reflect a Judeo-Christian ethic,

typically involves nonsectarian requests for wisdom and solemnity, as well as

calls for divine blessing on the work of the legislative body. When a legislative

body prevents its agents from reciting a prayer that falls outside this genre, the

legislators are merely enforcing the principle in <u>Marsh</u> that a legislative prayer is

constitutional if it is "simply a tolerable acknowledgment of beliefs widely held

among the people of this country." See <u>Marsh</u>, 463 U.S. at 792.[11]

---

[11]The traditional tone for legislative prayers can be found as early as the constitutional convention in 1787, when Benjamin Franklin proposed that the convention begin each morning with "prayers imploring the assistance of Heaven, and its blessings on our deliberations. . . ." 1 Max Farrand, <u>Records of the Federal Convention of 1787</u> 452 (1911), <u>quoted in</u> <u>Marsh</u>, 463 U.S. at 787 n.6.

The same tone also is evident in the prayers of Nebraska's legislative chaplain that the Supreme Court found unobjectionable in <u>Marsh</u>. See Joint Appendix at 92-108, <u>Marsh v. Cambers</u>, 463 U.S. 783 (1983) (No. 82-23). For example, in 1975, the Rev. Robert E. Palmer offered the following prayer: "For ties that continue to bind us together, even when the going is rough, for common purposes we continue to recognize as larger than we are, even when the business at hand taxes our patience and our constituents; for the privilege of sharing in the inspirations – as well as the frustrations – of events which make headlines . . . we now ask Your help, O Lord our God." <u>Id.</u> at 93-94. Similarly, in 1979 during the Easter season, the chaplain offered the following prayer: "Today as we are about to celebrate the great Holy Days of Christians and Jews, Holy Week and Passover, let us be reminded again through the faith and beliefs of our religions of the principles and directives which should guide us. . . . May these Holy Days, then, enable us to act as true followers of the beliefs which we have and may it find expression in every act and law that is passed." <u>Id.</u> at 108.

(continued...)

**III.  The constitutionality of Murray City's "Reverence Period"**

Turning now to the specifics of this case, Snyder's amended complaint sought a declaratory judgment that Murray City's "conduct is in violation of . . . the establishment protection . . . of the United States Constitution."  We do not perceive this request as seeking a declaration that Murray City's practice of beginning its council meetings with a prayer is unconstitutional as a whole. Rather, Snyder's request merely seeks a declaration that Murray City's particular denial of his individual request to participate in the city's "reverence period" at the opening of its meeting is unconstitutional.

Snyder's claim must fail as a matter of law because his proposed prayer falls well outside the genre of legislative prayers that the Supreme Court approved in Marsh and the record is devoid of evidence indicating an intent to promote or disparage any religion.  Not only does Snyder's prayer explicitly attack the genre itself, it also disparages those who believe that legislative prayer is appropriate. See Opening Prayer, supra note 3 (denouncing politicians who believe in the use of legislative prayer as "self-righteous," "hypocritical," "selfish," "mis-guided, weak and stupid," and calling the belief in the use of legislative prayer

---

[11](...continued)
Finally, a prayer offered in 1975 implored, "O Lord, our God, if ever we needed Thy wisdom and Thy guidance, it is now – as our Legislature begins a new session, standing upon the threshold of a new year, fraught with so many dangerous opportunities.  Id. at 92.

"blasphemous," "evil," and "cheapen[ing]").  Most importantly, Snyder's prayer aggressively proselytizes for his particular religious views and strongly disparages other religious views.  See id. (asking for divine assistance to "guide" civic leaders to "the wisdom of separating church and state" and to "never again perform demeaning religious ceremonies as part of official government functions").[12]  Snyder's prayer clearly draws on the tenets of his belief – which is an aspect of many different religious faiths – that prayer should only be conducted in private.  Because Snyder's prayer seeks to convert his audience to his belief in the sacrilegious nature of governmental prayer, his prayer is itself proselytizing.  As a result, Murray City was well within its rights under Marsh to deny permission for Snyder to recite his proposed prayer.  A deliberative body has a right to take steps to avoid the kind of government prayer that would run afoul of Marsh and the Establishment Clause.

Having concluded that Murray City did not violate the Establishment

---

[12]In fact, virtually every supplication in Snyder's "Opening Prayer" variously calls on the citizens and leaders of Utah to convert from their adherence to public governmental prayer.  In addition to the second paragraph quoted above, the third paragraph asks for divine assistance to "lead" Utah's politicians away from the practice of governmental prayer; the fourth paragraph asks that Utah's politicians be "educate[d]" and come to "understand" that prayer should be private and not used for the purpose of impressing others; the fifth paragraph asks that divine power "teach" the people of Utah that government should not participate in religion, and the sixth paragraph asks that divine power "deliver us from the evil of forced religious worship."  See Opening Prayer, supra note 3.

Clause in refusing Snyder's prayer, we next address the point raised by the dissent to the original panel decision in this case, to the effect that there is sufficient evidence in the record below to raise a dispute of fact as to whether Murray City relied on an impermissible motive in its denial of Snyder's prayer. See Snyder III, 124 F.3d at 1357-58 (Briscoe, J., dissenting). The record includes circumstantial evidence to suggest that City Attorney Hall's letter of June 1, 1994, in which he outlined Murray City's standards for legislative prayers, was drafted specifically to exclude the kind of prayer that Snyder had proposed. See id. (pointing out that City Attorney Hall was aware of and influenced by newspaper accounts of Snyder's dealings with the city council in Salt Lake City). However, this evidence only establishes that Hall was concerned with the political nature of the proposed prayer and with the fact that it was not consistent with the genre of legislative invocational prayer for which the opening portion of the legislation session had been reserved.

This evidence only tends to establish that Murray City acted with a "permissible" motive in excluding Snyder's proposed prayer. Snyder's proselytizing and disparaging prayer falls well outside the scope of invocational legislative prayers found to be constitutional in Marsh, and thus there was nothing improper about excluding it from the time properly set aside for legislative prayer. It was therefore permissible to exclude Snyder's prayer from the city's

- 24 -

'reverence period.' In drafting guidelines for council prayers that excluded Snyder's prayer, the record demonstrates that Hall was attempting to exclude the prayer because of its proselytizing and disparaging nature.

Finally, Snyder attempts to incorporate the Free Speech Clause of the First Amendment into his argument in this appeal. Because these contentions fall outside the limitation of our order for rehearing – confined as it was to the Establishment Clause issues in this case – we will not address them.

**Conclusion**

Under the Establishment Clause of the First Amendment, the municipal council of Murray City has the power to open its meetings with the kind of legislative prayer that our nation over the course of more than 200 years has come to see as "tolerable." See Marsh, 463 U.S. at 792. Furthermore, in the exercise of that power, Murray City has the discretion to prevent a proposed prayer that would be intolerable to that tradition. Snyder's prayer both proselytizes for his own particular brand of religion and disparages other contrary religious views. As such, it falls outside the genre of invocational legislative prayer authorized by Marsh, and Murray City did not violate the Establishment Clause in rejecting it. Thus, the district court correctly granted summary judgment against Snyder's Establishment Clause claim.

We AFFIRM the district court's dismissal of plaintiff's establishment claim.  The remainder of the original panel opinion remains in effect as originally issued in <u>Snyder III</u>, 124 F.3d at 1352-53, 1354-55.  We REMAND for further proceedings consistent with the disposition in <u>Snyder III</u>.  <u>See</u> <u>id.</u> at 1255.

96-4087, <u>Snyder v. Murray City</u>

**LUCERO**, Circuit Judge, concurring in the judgment.

I concur in the judgment that Mr. Snyder is not entitled to the relief he seeks on his Establishment Clause claim.[1] I arrive at this conclusion using a different analysis from that employed by the majority. I write separately to state my disagreement with what I believe to be the majority's impermissible extension of <u>Marsh v. Chambers</u>, 463 U.S. 783 (1983). <u>Marsh</u> holds squarely that "legislative prayer" delivered by an established chaplaincy system is not per se unconstitutional. But the <u>Marsh</u> Court did not consider the constitutionality of the prayer format utilized by Murray City, wherein prayers are routinely offered, at the City Council's invitation, by members of the public acting as representatives of discrete religious groups. Contrary to the view of the majority, I believe the city's choice of format proscribes regulation of the content of the prayers offered.

However, contrary to the dissent, I do not believe that the city's elimination of its content regulations can salvage the constitutionality of its chosen prayer format. Although I agree with the dissent that Murray City's practice of excluding certain prayers for their content violates the Establishment Clause, Snyder is not

---

[1] Like the majority, I do not read Snyder's amended complaint as directed to Murray City's practice of beginning its council meetings with prayer. With the majority, I understand that Snyder is only challenging the city's denial of his individual request to offer his prayer at the pre-meeting "reverence period." Were I to read his amended complaint more broadly, I would be obliged to endorse a result at odds with that reached by the majority.

entitled to give his prayer at a reverence period that is itself a violation of the

Establishment Clause.[2]   The remedy he wants is no remedy at all.

I

As plainly evidenced by the case before us, government officials operating an

open prayer format are inevitably drawn into regulating the content of the prayers

offered.[3]   The majority believes such regulation to be sanctioned by <u>Marsh</u>.   I

respectfully disagree.   Purporting to interpret and apply <u>Marsh</u> to this case, the

majority avers that a governmental body can constitutionally bar a particular

legislative prayer when "'the prayer opportunity has been exploited to proselytize

or advance any one, or to disparage any other, faith or belief.'" Maj. Op. at 18-19

(quoting <u>Marsh</u>, 463 U.S. at 794-95).   I believe it misguided, however, to read this

single passage from <u>Marsh</u> as standing for the far-reaching proposition that a

governmental body can, in all circumstances, allow certain legislative prayers while

censoring and barring others because they "proselytize" or "disparage" another

---

[2]   Given the summary judgment posture of this case, I am obliged to regard Snyder's proposed contribution to the reverence period as a genuine expression of his sincerely held religious beliefs.   See <u>Mosier v. Maynard</u>, 937 F.2d 1521, 1523-25 (10th Cir. 1991); Appellant's App. at 259 (Dep. of Tom Snyder) ("Q: And does this opening prayer represent sincerely held religious beliefs on your part? . . . A: Yes, it does.").   As a result, I accept, for purposes of analysis, the majority's assumption that Snyder's language comprises a prayer.

[3]   Asked to confirm that "Mr. Snyder's proposed prayer was rejected because of the content and for no other reason," Mr. H. Craig Hall, the Murray City Attorney, responded: "I think that is an accurate statement."   Appellee's App. at 88-89.

- 2 -

faith or religious belief.  Read properly, in the factual and historical context that anchors the case, Marsh does not vest a governmental body with such powers.

Marsh states that "[t]he question presented is whether the Nebraska Legislature's practice of opening each legislative day with a prayer by a chaplain paid by the State violates the Establishment Clause." 463 U.S. at 784; see also id. at 786 ("We granted certiorari limited to the challenge to the practice of opening sessions with prayers by a State-employed clergyman.") (citing 459 U.S. 966 (Nov. 1, 1982)).  Although Marsh may perhaps be read to extend to circumstances in which chaplains are not paid and in which there is no single officiating clergyman, see id. at 794 n.18, the opinion's historical treatment of legislative prayer shows that Marsh involves, and should be limited to, established chaplaincies—chaplaincies that are so structured that they become an arm or an office of the legislature.[4]

Congressional chaplains, like the chaplain at issue in Marsh, are not members of the public invited on some representative or wholly open basis to give legislative prayers.  They are officers of the state, who hold official government positions. Referring to the origins of legislative prayer, the Marsh Court noted that:

> The tradition [of legislative prayer] in many of the colonies was, of course, linked to an established church, but the Continental Congress,

---

[4] Of course, whether or not a chaplaincy is a salaried position may be an indicium of whether its occupant is an official government agent.

beginning in 1774, adopted the traditional procedure of opening its sessions with a prayer offered by a paid chaplain. Although prayers were not offered during the Constitutional Convention, the First Congress, as one of its early items of business, adopted the policy of selecting a chaplain to open each session with a prayer.

Id. at 787-88 (footnotes and citations omitted). Marsh underscores the fact that congressional chaplains are official governmental functionaries when, in discussing the history of the position, it states:

[O]n April 7, 1789, the Senate appointed a committee "to take under consideration the manner of electing Chaplains." On April 9, 1789, a similar committee was appointed by the House of Representatives. On April 25, 1789, the Senate elected its first chaplain; the House followed suit on May 1, 1789. A statute providing for the payment of these chaplains was enacted into law.

Id. at 788 (footnote and citations omitted). Noting that Nebraska's chaplaincy practice "is consistent with the manner in which the First Congress viewed its chaplains," Marsh further states that "[r]eports contemporaneous with the elections [of congressional chaplains] reported only the chaplains' names and not their religions or church affiliations." Marsh, 463 U.S. at 794 n.16. This again serves to make the point that the nature of the chaplaincy with which Marsh deals does not involve people acting as members, leaders, or spokespersons of particular religions. Rather, they are people who are first and foremost acting as officers of the various legislative bodies they serve.

It is this fact that explains <u>Marsh</u>'s cautionary language—on which the majority ultimately rests—that legislative prayer not be "exploited to proselytize or advance any one, or to disparage any other, faith or belief." <u>Id.</u> at 794-95.  Plainly, established legislative chaplaincies may not proselytize, or disparage a particular belief, consistent with the dictates of the Establishment Clause.  Such chaplains speak for the legislature, and may not therefore champion particular religious beliefs while disparaging others.  But, by the same token, the government has the authority to tell its representatives what they can and cannot do in their official capacities.  <u>See</u> <u>Rosenberger v. Rector & Visitors of Univ. of Va.</u>, 515 U.S. 819, 833 (1995) ("[W]hen the State is the speaker, it may make content-based choices.").  Prohibiting official chaplaincies from proselytizing on behalf of one religion, or disparaging another, is not only within the powers of the government, but serves a crucial Establishment Clause purpose because it ensures that the government does not, through its officers, espouse one particular religious view to the detriment of others.

However, when the person giving a legislative prayer does <u>not</u> speak from an established chaplaincy position, then <u>Marsh,</u> standing for the proposition that the government <u>may</u> censor prayers of proselytization, is inapplicable.[5]  What is

_____

[5]  Admittedly, the line between an established chaplaincy and an open prayer system is not a bright one.  But, as the Supreme Court has frequently

(continued...)

- 5 -

applicable is the Supreme Court's traditional Establishment Clause jurisprudence,

specifically its prohibition on "excessive entanglement." See Lemon v. Kurtzman,

403 U.S. 602, 614 (1971). The process of policing the prayers offered in an

attempt to exclude proselytization or disparagement will inevitably "call[] for

official and continuing surveillance leading to an impermissible degree of

entanglement." Walz v. Tax Comm'n, 397 U.S. 664, 675 (1970); see also Widmar

v. Vincent, 454 U.S. 263, 272 n.11 (1981) (public university that offers its

facilities for student group meetings "risk[s] greater 'entanglement'" by attempting

to enforce exclusion of groups practicing religious worship and speech, in part

because of "continuing need to monitor group meetings to ensure compliance with

---

[5](...continued)
noted, that is a feature inevitably common to much Establishment Clause jurisprudence. See, e.g., Lynch v. Donnelly, 465 U.S. 668, 678-79 (1984) ("The Establishment Clause like the Due Process Clauses is not a precise, detailed provision in a legal code capable of ready application. . . . The line between permissible relationships and those barred by the Clause can be no more straight and unwavering than due process can be defined in a single stroke or phrase or test. The Clause erects a 'blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship.'") (quoting Lemon v. Kurtzman, 403 U.S. 668, 614 (1971)). But there can be no doubt that the facts of this case place it squarely outside Marsh. Murray City's practice sought "to invite a diverse community" to speak at prayer sessions, Appellee's App. at 10, and these invitations were sent to "associations" of a "religious nature," id. at 71-72. There is no suggestion in the record that such a diverse community of religious bodies, offering prayers before council meetings, spoke as government functionaries. Indeed, the City Attorney confirms that, in many cases, he has no idea what the invited parties will say—precisely because he does not know what religious beliefs such parties even hold. See id. at 183.

the rule"); <u>Lemon</u>, 403 U.S. at 620 (statute's requirement that government examine school records to determine how much of total school expenditure is attributable to secular education and how much to religious activity, "is fraught with the sort of entanglement that the Constitution forbids").  Prayers will either have to be submitted for approval in advance, as was the case for Mr. Snyder, <u>see</u> Appellee's App. at 199 ("Until your proposed prayer satisfies these guidelines, an invitation to participate in our opening ceremonies will not be forthcoming"), then assessed by some government body using pre-established government criteria that purport to distinguish proselytizing from non-proselytizing behavior, or else assessed on the spot—the gavel ready—for such content before the amen is spoken.[6]  And the process will have to be repeated time after time.

I cannot accept that the Constitution allows the government to subject private citizens—as opposed to official chaplaincies—to such liturgical supervision.  "It is a cornerstone principle of our Establishment Clause jurisprudence that 'it is no part of the business of government to compose official prayers for any group of the American people to recite as a part of a religious

---

[6]  A final alternative—that the government only extend invitations to those religious groups that it adjudges likely to abide by an implicit bar against proselytizing, a practice which may have occurred here, <u>see</u> Appellee's App. at 155—is obviously no less entangling.  Such practice also raises the specter of religious groups molding public statements of their creeds in ways designed to elicit governmental approval, thus offending one of the core historical purposes of the Establishment Clause.  <u>See</u> <u>infra</u> note 13.

program carried on by government.'" <u>Lee v. Weisman</u>, 505 U.S. 577, 588 (1992)

(quoting <u>Engel v. Vitale</u>, 370 U.S. 421, 425 (1962)).[7]

## II

However, the dissent's suggested alternative to the majority's proposal that

the City Council regulate the content of public prayer offered during a pre-meeting

[7] The foregoing analysis accepts the majority's implicit assumption that Murray City rejected Snyder's prayer because it proselytized and disparaged other religions. Like the dissent, however, I believe the record raises serious questions as to whether this was in fact the City's grounds for refusing the prayer.

Mr. Hall, the City Attorney who made the decision to reject Snyder's prayer, claims that he did so pursuant to a long-standing, albeit implicit and never before invoked, practice of refusing prayers or invocations that expressed political views, or attacked or mocked city policies and practices. <u>See</u> Appellee's App. at 195. There is scant suggestion in the record that Hall refused the prayer because it disparaged other faiths. Rather, Hall's claimed focus was on what he perceived as disparagement of the City Council and its practice of allowing pre-meeting prayers.

Nonetheless, Snyder still validates his Establishment Clause claims. Even if one assumes Hall did not develop the stated criteria as a pretext for religious viewpoint discrimination (which assumption I make only for the purposes of the present discussion), the mere application of the criteria violates the Establishment Clause for at least two reasons. First, such application discriminates against religions that encompass stated tenets Hall deems inappropriately "political." If we assume, as we must, that Snyder's prayer is premised on his religious views, then Hall's objection to Snyder's "politics" inevitably amounts to discrimination against his religion as well. Second, development and application of the criteria necessitate a governmental determination of whether religious views are inappropriately political. That kind of determination requires an excessively entangling interaction between the machinery of government and religious practice. <u>See</u> <u>infra</u> section III; <u>cf.</u> <u>Widmar</u>, 454 U.S. at 272 n.11 (given breadth and indeterminacy of what speech is "religious," state actor risks excessive entanglement by trying to identify and exclude such speech from public facilities).

reverence period—namely that the City permit all prayers, Snyder's included—is also unconstitutional. As Snyder's "prayer" starkly demonstrates, without content-based restrictions, the "reverence period" established by Murray City will be used to disparage the religious beliefs of others. The resulting juxtaposition of aggressive proselytization with the exercise of legislative power violates the Establishment Clause.

Invocation of <u>Marsh</u> cannot protect such prayer. Once the government steps outside the historically determined confines of <u>Marsh</u>, it cannot regulate the content of the prayers it sponsors. The resulting unregulated government prayer sessions come to pose, as this case clearly illustrates, an unacceptable and inevitable risk of the advancement of certain faiths at the expense of others. A prayer session in which Snyder is offered—and takes—the opportunity to denigrate the faith of others is historically and philosophically far-removed from what <u>Marsh</u> sanctions as the "tolerable acknowledgment of beliefs widely held among the people of this country." <u>Marsh</u>, 463 U.S. at 792. As the majority correctly observes, <u>Marsh</u> speaks only to legislative prayer of a specific "religious genre." Maj. Op. at 15-16. <u>Marsh</u>'s reliance on the ecumenism of the Nebraska prayers is not to be ignored—just as it is not to be read to repudiate the Court's entire jurisprudence of excessive entanglement. To be constitutional, legislative prayer must be "part of the fabric of our society," <u>Marsh</u>, 463 U.S. at 792, or, as the majority aptly puts it,

"a kind of ecumenical activity that seeks to bind peoples of varying faiths together in a common purpose," Maj. Op. at 21. If the offerings at a legislative prayer session depart from this historical norm, which—as Mr. Snyder's prayer shows—they assuredly will once Murray City frees the public forum it has created from content-based restrictions, then they can gain no protection from Marsh.

Outside the purview of Marsh, and subject to the usual canons of Establishment Clause jurisprudence, government-sponsored open prayer sessions marked by uncontrolled proselytizing are unconstitutional. True, the purpose of an open and unrestricted prayer session may, by analogy to Marsh, pass muster under the first step of the three-part Lemon test, 403 U.S. at 612.[8] See Lynch v. Donnelly, 465 U.S. 668, 680-81 (1984) (city's display of creche has "legitimate secular purposes" of celebrating, and depicting origins of, national holiday). A legislative body's intention in maintaining an open prayer session may be simply to "solemniz[e] public occasions, express[] confidence in the future, and encourag[e] the recognition of what is worthy of appreciation in society." Lynch, 465 U.S. at 693 (O'Connor, J., concurring).

---

[8] In Lemon, the Court describes the following test: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion." Lemon, 403 U.S. at 612-13 (1971) (internal quotation and citations omitted).

But the <u>effects</u> of such prayer are very different from the situation considered in <u>Marsh</u>, precisely because once members of the public are invited to pray, the government must relinquish its power to exclude those prayers that proselytize or disparage. The remedy Snyder would have us endorse for himself and others would require the government to invite proselytizers to initiate its meetings—which it cannot do without violating both the second and third steps of <u>Lemon</u>, which proscribe, respectively, "a principal or primary effect" of advancing or inhibiting religion, and "foster[ing] an excessive government entanglement with religion." <u>Lemon</u>, 403 U.S. at 612-13 (citations omitted). A principal effect of open prayer, as practiced by Snyder and others, will be the symbolic association of government power with religious—and antireligious—intolerance and bigotry. [9]

---

[9] The situation would be constitutionally different were the "reverence period" not so significantly characterized by religious activity. See Board of Educ. v. Mergens, 496 U.S. 226, 248 (1990) ("[I]f a State refused to let religious groups use facilities open to others, then it would demonstrate not neutrality but hostility toward religion."). Despite Murray City's countless legal pleadings that the reverence period was open to all-comers, religious and non-religious alike, and for purposes similarly religious and non-religious, the record is all but completely devoid of any support for such a conclusion. This may explain why both the district court, see Appellant's App. at 597, and the majority today, see Maj. Op. at 3, appear to assume that invitations were only extended to religious groups and for the purpose of prayer. From the facts in the record, only one legal conclusion can follow: the "reverence period" is primarily characterized by religious activity. There is simply no way that the content of these sessions is sufficiently secular for them not to advance religion unconstitutionally. Compare Widmar, 454 U.S. at 269, 272-75 & n.12 (where state-provided forum is "generally" and "equally" open for use by religious and non-religious groups,

(continued...)

- 11 -

[9](...continued)
allowing religious groups does not have primary effect of advancing religion) with County of Allegheny v. ACLU, 492 U.S. 573, 599-600 & n.50 (1989) (Op. of Blackmun, J.) (display of privately-sponsored creche on "Grand Staircase" of county courthouse violates Establishment Clause because "[t]he Grand Staircase does not appear to be the kind of location in which all were free to place their displays").

The City Attorney's letter of June 1, 1994, to Snyder, states that "the Council has established the policy that all council meetings will start with prayer," Appellee's App. at 195, and defendants' answer to Snyder's amended complaint concedes this point, see id. at 5 & Appellant's App. at 82. I cannot agree with the City Attorney's unlikely semantics, whereby prayer does not denote inherently religious activity. (Nor, one might add, could the Supreme Court of Utah. See Society of Separationists v. Whitehead, 870 P.2d 916, 931-32 (Utah 1993)). Hall appears to concede the religious character of the proceedings when he confirms that the invited groups were "associations" of a "religious nature." Appellee's App. at 71-72. Asked to confirm that prayers were "religious exercise," Hall replies, "Not necessarily," id. at 53, but his only substantiation of that qualification is as follows: "We had some Navajos that came and left a blessing and I don't know if it was a religious exercise or not." Id. The City Attorney's lack of familiarity with Native American culture simply cannot be enough to render the prayer sessions primarily non-religious in nature. The defendants' answer to Snyder's amended complaint further supports this view by arguing that Snyder's proposed contribution to the reverence period was justifiably refused because "it was not a sincere and earnest entreaty directed to a divinity," and consequently fell outside the definition of "prayer." Appellant's App. at 83.

Murray City points to two items in the record in support of its claim on this point. Neither, in light of the overwhelming evidence to the contrary, can carry any weight whatsoever. The first is a form letter sent to invited groups, which refers to Murray City's effort "to encourage community and religious leaders, representative of the diverse culture of the Salt Lake Valley, to participate in this meaningful segment of our meetings." Appellee's App. at 201. This vague language in a form letter does nothing to obviate the conspicuous failure, save for the erroneous reference to the Navajo blessing, to point to a specific non-religious association to whom an invitation was extended. The second item is Hall's claim that the list of invited parties includes "some nondenominational groups." See id.

(continued...)

And the "divisive political potential" of such prayer, which the case law identifies as a significant component of "excessive entanglement," see Lemon, 403 U.S. at 622-23, is self-evident. "[A] prayer which uses ideas or images identified with a particular religion may foster a different sort of sectarian rivalry than an invocation or benediction in terms more neutral," Weisman, 505 U.S. at 588, and that is even more the case when a prayer aggressively proselytizes and disparages the convictions of others present.

This stands in stark contrast to Marsh. The ecumenism of Marsh's legislative prayer does not advance religion beyond the Supreme Court's general recognition that "[w]e are a religious people whose institutions presuppose a Supreme Being." Zorach v. Clauson, 343 U.S. 306, 313 (1952). The same is true of other "official references to the value and invocation of Divine guidance." Lynch, 465 U.S. at 675. [10] But what is true of the prayers in Marsh, the creche in

_____

[9](...continued)
at 69-70. As "nondenominational" does not mean "secular," I am unsure why Murray City should believe this renders the proceedings open to all, believers and nonbelievers alike. Indeed, Hall emphasizes how the prayer session differed from the Council's period for comments by individual members of the public, to which Snyder would have been welcome. See id. at 56-57. In short, a few evasive and ambiguous statements cannot support the implausible conclusion that "prayer" has nothing to do with religion. Thus this case conspicuously lacks the "important index of secular effect" that is provided by the "provision of benefits to [a] broad spectrum of groups." Widmar, 454 U.S. at 274.

[10] It is for this reason that numerous forms of everyday "ceremonial deism" pass constitutional muster. (This phrase is used in County of Allegheny, 492 U.S.
(continued...)

- 13 -

Lynch, and the Sunday closing laws in McGowan v. Maryland, 366 U.S. 420 (1961), namely that their "reason or effect merely happens to coincide or harmonize with the tenets of some or all religions," id. at 442, is assuredly not the case for an open prayer session, sponsored by a legislative body, in which proselytization and disparagement must of necessity be allowed. When the government invites a cross-section of religious parties—proselytizers included—to appear before its meetings, the resulting disparagement of other faiths can hardly be regarded as mere happenstance. [11] Consequently, I cannot agree that this case presents grounds for a remand. Snyder has shown an Establishment Clause violation in the city's exclusion of his prayer, but his requested remedy would violate the Establishment Clause just as surely.

---

[10](...continued)
at 595 n.46 (Op. of Blackmun, J.), and was coined by Walter Rostow in 1962. See Steven B. Epstein, Rethinking the Constitutionality of Ceremonial Deism, 96 Colum. L. Rev. 2083, 2091-92 (1996)). An incomplete list of such practices would obviously include the post-1954 Pledge of Allegiance ("under God"); the national motto as inscribed on our national currency ("In God We Trust"); the invocation to the Deity prior to judicial proceedings ("God save the United States and this Honorable Court"); the swearing-in of government officials and witnesses in court proceedings ("so help me God"); public holidays on Christian Holy Days; references to the Almighty in inaugural addresses; and Thanksgiving Day proclamations.

[11] Or, to put it in terms of Justice O'Connor's "endorsement" analysis, see Wallace v. Jaffree, 472 U.S. 38, 76 (1985) (O'Connor, J., concurring), Snyder's prayer, if given at an open prayer session before a City Council meeting, would strike an "objective observer" as government endorsement of the disparagement of faith.

- 14 -

## III

The majority assumes that in approving the chaplaincy format before it in Marsh, the Court somehow sanctioned a different format which permits a city council routinely to initiate its meetings with an open prayer session at which members of the public are invited to pray. I disagree with that view, just as I would with the proposition that by favorably referring to our customary practice of opening court with the familiar intonement, "God save the United States and this Honorable Court," Marsh somehow would permit us to require the Clerk of the Court to organize a reverence period at the opening of court assuring that representatives of a broad spectrum of religious denominations are included in a prospective list of supplicants invited to seek the blessings of Providence on the proceedings of the day. The very organization of such prayer sessions—in the case at bar, the organization and selection of those delivering prayer is a duty of the Secretary to the City Council, see Appellee's App. at 36—comes perilously close to the establishment of religion.

Certainly, the mere administration of an open prayer session by the government may result in a level of entanglement far beyond that sanctioned by historical practice in Marsh. That is so, even when, as a result of the free choice of the invited public, a legislative prayer session is not marked by proselytization or disparagement. In running a prayer session open to the public, the government will

- 15 -

need to identify which members of the public appropriately represent the diverse

religious life of the community. That will require a government determination of

what creeds and philosophies are to count as religious. Given the inevitable limits

on the time available for legislative prayer, the government may also have to

resolve which are sufficiently representative to earn its favor, and in what order.[12]

Finally, as in this case, the government will have to distinguish between prayer and

political statement.[13]

　　None of the administrative machinery necessary to such tasks is endorsed by

Marsh. There, because our social and political history has already made the

necessary determinations, there is less need for day-to-day governmental

---

[12] According to Mr. Hall, the City Attorney, "[i]ts impossible when you have only 24, 25 Council meetings to offer everybody the opportunity to pray." Appellee's App. at 159.

[13] There is also a grave risk that religious groups will seek to earn the government's favor with the intention of obtaining an invitation, or of increasing the frequency of their invitations, or of being invited to speak before especially significant and visible legislative sessions. In seeking governmental favor, religious groups may become subject to an implicit form of government regulation—a danger that underlies much Establishment Clause jurisprudence. See Weisman, 505 U.S. at 609 ("We have believed that religious freedom cannot thrive in the absence of a vibrant religious community and that such a community cannot prosper when it is bound to the secular.") (Blackmun, J., concurring). We note in this case that the City Attorney, when asked whether the city inquires as to the content of a prayer prior to its delivery, responded: "As far as I know we've never asked. There has been no need to ask. Everybody has been so positive and met the unwritten guidelines . . . ." Appellee's App. at 155. The Attorney's apparent cause for celebration is—to my mind—cause for grave constitutional concern.

administration of a legislative prayer "system." Because this case is so readily resolved on the two grounds identified above, I need not conclusively determine whether Murray City's administration of its prayer system unconstitutionally entangles government and matters of religion. But legislative bodies should appreciate that an open prayer system has the potential, in its mere administration, to violate the Establishment Clause.

**IV**

Under the foregoing analysis, government would have to seek the sanctuary of <u>Marsh</u> should it wish to maintain legislative prayer. It may appear ironic that the Establishment Clause should endorse official chaplaincies, while proscribing a practice of inviting prayer volunteers who represent many and varied religious faiths. But though this effect may appear establishmentarian, a closer inspection proves otherwise. In fact, the strength and diversity of religious life is doubly benefitted by a legislative retreat to <u>Marsh</u>.

First, <u>Marsh</u> requires that official chaplaincy systems do not proselytize for one religion or disparage others. Though official chaplains speak with the authority of government to an unparalleled extent, <u>Marsh</u> ensures that their pronouncements are broadly ecumenical—no more religious, indeed, than the "fabric of our society" at large. <u>Marsh</u>, 463 U.S. at 792. Second, as Madison recognized, "[r]eligion flourishes in greater purity, without than with the aid of

Gov[ernment]." James Madison, Memorial and Remonstrance against Religious Assessments (1785), in The Complete Madison 309 (S. Padover ed. 1953). As this case shows, when bound to the secular, religion is no longer free to "flourish according to the zeal of its adherents and the appeal of its dogma." Zorach, 343 U.S. at 313.

No. 96-4087, <u>Snyder v. Murray City Corp.</u>

**BRISCOE**, Circuit Judge, dissenting:

I respectfully dissent. Underlying the majority's opinion is the implicit assumption that the reverence portion of City Commission meetings is a nonpublic forum in which the speakers, though not paid by or otherwise directly connected to the City, speak on behalf of the City. Based upon this assumption, the majority concludes the City has the right to control or regulate who speaks on its behalf and what message is conveyed. Because I disagree with the majority's underlying assumption, I also disagree with its conclusion that the City properly rejected Snyder's request to speak based upon the content of his proposed prayer.

I.

In <u>Rosenberger v. Rector & Visitors of Univ. of Va.</u>, 515 U.S. 819 (1995), the Court emphasized the importance of context in determining the extent to which the government can control speech. "[W]hen the State is the speaker," the Court noted, "it may make content-based choices." <u>Id.</u> at 833. More specifically, it may "regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message." <u>Id.</u> In contrast, when the State simply facilitates "a diversity of views from private speakers," it may not discriminate based on the viewpoint of a particular private speaker. <u>Id.</u> at 834.

It is therefore critical, in deciding Snyder's appeal, to first determine the context in which the dispute arose. More specifically, it is necessary to decide

whether Snyder was denied the opportunity to speak on behalf of the City or whether he was denied the opportunity to speak on his own behalf. As is apparent from the discussion in <u>Rosenberger</u>, the determination of this context will have a dramatic effect on how the appeal is analyzed and ultimately decided.

In rejecting Snyder's Establishment Clause claim, the majority implicitly assumes persons who speak during the reverence period do so on behalf of the City. Armed with this assumption, the majority concludes, based upon its interpretation of <u>Marsh v. Chambers</u>, 463 U.S. 783 (1983) (deciding constitutionality of opening legislative sessions with a prayer by a chaplain appointed and paid by state), that the City has the right to control the content of messages conveyed during the reverence period, and the City did not violate the Establishment Clause by rejecting Snyder's tendered prayer because, in the majority's opinion, the prayer falls outside the bounds of constitutionally permissible legislative prayer. For reasons that follow, I cannot accept the majority's assumption.

As I indicated in my dissenting opinion from the original panel opinion, I believe "a reasonable observer aware of the City's practice of inviting persons representing a broad range of religious and nonreligious viewpoints to give invocations would not regard Snyder's prayer as representing the City's endorsement of his particular beliefs." <u>Snyder v. Murray City Corp.</u>, 124 F.3d

1349, 1357 (10th Cir. 1997) (dissenting opinion). In other words, I do not believe any of the speakers offering prayers during the reverence period could reasonably be perceived as speaking on behalf of the City. See generally County of Allegheny v. American Civil Liberties Union, 492 U.S. 573, 595 (1989) (endorsement test depends on observer's reasonable perception of particular government policy).

To illustrate the point more thoroughly, I believe it is helpful to review the type of forum with which we are dealing.[1] See generally Capitol Square Review Bd. v. Pinette, 515 U.S. 753, 761 (1995) (applying forum analysis to decide Establishment Clause issue). "[T]he Supreme Court has recognized three distinct categories of government property: (1) traditional public fora; (2) designated public fora; and (3) nonpublic fora." Summum v. Callaghan, 130 F.3d 906, 914 (10th Cir. 1997) (citing Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45-46 (1983)). Undoubtedly, the reverence period at issue here does not fall within the category of traditional public fora for it is not at all similar to areas such as "streets and parks[,] which 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly,

_____

[1] Although the scope of our en banc review is purportedly limited to Snyder's Establishment Clause claim, the inescapable fact is that this case lies at the intersection of the Establishment, Free Speech, and Free Exercise Clauses of the First Amendment. Thus, although the concepts of public fora are typically associated with cases involving free speech claims, they are useful in deciding the outcome of this case.

- 3 -

communicating thoughts between citizens, and discussing public questions.'" Perry, 460 U.S. at 45 (quoting Hague v. C.I.O., 307 U.S. 496, 515 (1939)). Instead, the reverence period is either a designated public forum or a nonpublic forum.

"A designated public forum is property the government has opened for expressive activity, treating the property as if it were a traditional public forum." Summum, 130 F.3d at 914. Such a forum "may be created for a limited purpose such as use by certain groups . . . or for the discussion of certain subjects." Perry, 460 U.S. at 45 n.7. In contrast, a nonpublic forum is "[p]ublic property which is not by tradition or designation a forum for public communication." Id. at 46. "Implicit in the concept of the nonpublic forum is the right [of the government] to make distinctions in access on the basis of subject matter and speaker identity." Id. at 49.

"The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." Cornelius v. NAACP Legal Defense & Ed. Fund, 473 U.S. 788, 802 (1985). To determine whether the government has intentionally created a designated public forum, we look to "the policy and practice of the government," as well as "the nature of the property and its compatibility with expressive activity." Id.

Since 1982, the City in this case has incorporated a reverence period as part of the opening ceremonies of its City Council meetings. Speakers during the reverence period are not public officials. Rather, the City has "made efforts to assure that a broad cross-section of the community would be represented" during the reverence period. Appellant's App. at 162. To effectuate this goal, Jewel Chandler, the secretary to the City Council, regularly "compile[s] lists of various denominations and other groups" who she thinks "would be potentially willing to come to the City Council meetings based on invitation to give a thought, prayer, whatever." Appellee's App. at 36-37. Chandler sends invitations to these groups, which read in part:

> It has long been a custom of the Murray City Municipal Council to include an invocation or inspirational message as part of the opening ceremonies in Council meetings.
> Several years ago the Murray City Council undertook a vigorous effort to encourage community and religious leaders, representative of the diverse culture of the Salt Lake Valley, to participate in this meaningful segment of our meetings.
> We would, therefore, invite you to be a part of this program by consenting to offer an invocation, appropriate message or inspirational thought at one of our meetings.

Id. at 201. According to the City, participants in the reverence period "have included representatives from Zen Buddhists, Native Americans, a cross section of Judeo-Christian congregations, Quakers, and others." Appellant's App. at 163. The invitations contain no restrictions on the messages that speakers can give. Further, at no time (save for this case) has the City ever asked a particular speaker

- 5 -

about content of a message or conveyed any guidelines to a particular speaker. In fact, City Attorney Hall testified:

> I don't have a clue . . . what the Murray Baptist Church is going to say just as I did not have a clue as to what the Zen Buddhists were going to say. I don't know what the religious beliefs are. I don't know the particular tenants of their religious beliefs. I don't have a clue what they're going to say.

Appellee's App. at 183. Hall also testified:

> If a person wants to talk in the Buddhist faith about exhortation and blessings, that's fine. If the Navajos want to come in and do what they do. If the Catholics and Buddhists and Baptists and Seventh Day Adventists come in and don't mock city practices and policies and procedures during that period of time, we're not going to determine what their expression of thought or their statements are going to be.

Id. at 157. Finally, prior to Snyder's request to speak, the City had not developed any guidelines concerning the content of messages that could be given during the reverence period.

Taken together, I believe these uncontroverted facts demonstrate an intent on the part of the City to designate the reverence period as a public forum open to members of the community for the purpose of conveying religious and/or inspirational messages. In reaching this conclusion, I find significant (1) the City's goal of having a broad cross-section of the community speak during the reverence period, and (2) the lack of restrictions placed on reverence period speakers. To me, both of these factors indicate the City's intent to treat the reverence period as a setting open to all community members, regardless of

religious viewpoint. I also find significant the fact that the reverence period occurs within the broader framework of the City Commission meetings, which themselves are designated public forums given the fact that citizens are encouraged to attend and voice their opinions. See Grossbaum v. Indianapolis-Marion County Bldg. Auth., 100 F.3d 1287, 1296 (7th Cir. 1996) ("Legally created public fora are fora such as school board meetings"), cert. denied 117 S. Ct. 1822 (1997); compare Widmar v. Vincent, 454 U.S. 263, 267 n.5 (1981) (in considering whether university meeting facilities were a public forum, the Court emphasized the campus possessed many characteristics of a traditional public forum), with Cornelius, 473 U.S. at 805 (in concluding the combined Federal Campaign charity drive was a nonpublic forum, the Court emphasized the federal workplace, where the drive took place, was a nonpublic forum). With regard to this latter point, a finding that the reverence period is a designated public forum is not inconsistent with the "normal uses" of the overall setting (i.e., the City Commission meetings).

The conclusion that the reverence period is a designated public forum for private religious/inspirational expression demonstrates that the City's ability to control the content of messages conveyed during the reverence period is much more limited than suggested by the majority. "For the State to enforce a content-based exclusion" when dealing with access to any type of public forum, "it must show that its regulation is necessary to serve a compelling state interest and that it

is narrowly drawn to achieve that end." Perry, 460 U.S. at 45. Although "compliance with the Establishment Clause is a state interest sufficiently compelling to justify content-based restrictions on speech," Pinette, 515 U.S. at 761-62, no such interest was present here. Specifically, because Snyder could not have reasonably been perceived as speaking on behalf of the City, there was no necessity for the City to edit his prayer or deny him the opportunity to speak based on the content of his proposed prayer.[2] See Pinette, 515 U.S. at 763 (state could not justify content-based restrictions because there was no potential Establishment Clause violation); Lamb's Chapel v. Center Moriches Union Free School Dist., 508 U.S. 384, 395 (1993) (same); Widmar, 454 U.S. at 276 (same).

---

[2] Even if the reverence period is considered a nonpublic forum, I do not believe the speakers were speaking on behalf of the City. Rather, for many of the reasons already outlined, I believe the City chose to allow private citizens access to the forum to speak on the subject matter of religion and spirituality. See Lamb's Chapel v. Center Moriches Union Free School Dist., 508 U.S. 384 (1993) (school district chose to allow private citizens access to nonpublic forum for wide variety of social, civic, and recreational purposes); see also Summum, 130 F.3d at 914-19 (discussing nonpublic forums which have been opened for limited access to public). Thus, the only way the City could have properly rejected Snyder is if its decision was "reasonable in light of the purpose served by the forum and [was] viewpoint neutral." Cornelius, 473 U.S. at 806 (discussing restrictions on access to nonpublic forum); see also Grossbaum v. Indianapolis-Marion Bldg. Auth., 63 F.3d 581, 587 (7th Cir. 1995). I do not believe the denial of access to the forum would have been reasonable if it was based on concern about a potential Establishment Clause violation, nor do I believe the City Attorney's stated reasons for the denial were reasonable. Rather, I believe the uncontroverted evidence indicates Snyder was denied access solely to suppress the point of view he espoused in his tendered prayer. Cornelius, 473 U.S. at 806.

Ultimately, I believe the City overstepped its bounds and violated the Establishment Clause by rejecting Snyder's request to speak based on its distaste for the content of his tendered prayer. "[T]he [Establishment Clause's] guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse." Rosenberger, 515 U.S. at 839. Here, however, "[t]he neutrality commanded of the State by the separate Clauses of the First Amendment was compromised by the [City's] course of action." Id. at 845. In particular, the City's action evinced a hostility toward Snyder's religious viewpoints, and thereby "undermine[d] the very neutrality the Establishment Clause requires." Id. Stated in different terms, the City's action clearly had the effect of disapproving of Snyder's religious viewpoints.[3] See County of Allegheny, 492 U.S. at 592-93.

In the end, the City cannot have it both ways: it cannot purport to open the reverence period to a broad cross-section of the community without restrictions, while at the same time limiting a particular speaker's access to the reverence period because of its distaste for the speaker's proposed message. Thus, I believe

---

[3] In my dissenting opinion from the original panel decision, I outlined in greater detail why I believed the City's actions violated the test set forth in Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971). 124 F.3d at 1358-60. I continue to stand by my earlier analysis, but find it unnecessary to incorporate all of it into this opinion.

it must either allow Snyder the opportunity to give his tendered prayer or cease its currently-formatted reverence period altogether.

## II.

Even assuming, arguendo, I were to accept the majority's assumption that the reverence period is a nonpublic forum in which the speakers offer prayers and messages on behalf of the City, I could not fully join the majority opinion. In particular, I believe the majority has adopted an improper analytical framework that requires it to do precisely what the Supreme Court in Marsh was loathe to do: sit as a board of censors on an individual prayer. Further, I am not convinced the majority's framework is useful for determining whether the City acted with improper motives.

Only a minor portion of Marsh touches on the propriety of selecting government-sanctioned speakers for invocational prayer sessions. In particular, the appellant challenged the fact that the Nebraska legislature, in carrying out its practice of invocational prayer, had selected a chaplain of only one denomination over a period of approximately sixteen years. The Court rejected this challenge, stating:

> We, no more than members of the Congresses of this century, can perceive any suggestion that choosing a clergyman of one denomination advances the beliefs of a particular church. To the contrary, the evidence indicates that [the chaplain] was reappointed because his performance and personal qualities were acceptable to the body appointing him. [He] was not the only clergyman heard by the

Legislature; guest chaplains have officiated at the request of various legislators and as substitutes during [his] absences. Absent proof that the chaplain's reappointment stemmed from an impermissible motive, we conclude that his long tenure does not in itself conflict with the Establishment Clause.

463 U.S. at 793-94. Although the quoted language does not provide us with a precise framework to follow in determining the constitutional propriety of a particular selection (or rejection) decision, it nevertheless provides us with two important principles. First, it expressly indicates we should focus on <u>evidence</u> pertaining to the legislative body's reasons for selecting or rejecting a particular speaker. Second, in analyzing such evidence, the ultimate question is whether or not the selection or rejection "stemmed from an impermissible motive." 463 U.S. at 793.

In establishing its framework for reviewing Snyder's claim, the majority acknowledges the second principle, but effectively ignores the first. The majority begins by acknowledging that, in accordance with <u>Marsh</u>, a selection decision cannot stem from an impermissible motive. Based upon this principle, the majority then concludes "there is no 'impermissible motive' when a legislative body or its agent chooses to reject a government-sanctioned speaker because the tendered prayer falls outside the long-accepted genre of legislative prayer." From this conclusion, the majority makes the insupportable leap in logic that the issue of motive can be decided solely by focusing on the content of the proposed prayer.

Ultimately, because the majority believes Snyder's proposed prayer falls outside the boundaries of acceptable legislative prayer, it concludes the City acted with permissible motives in rejecting the prayer.

The majority's analytical framework runs counter to Marsh. Marsh provides prayer content is simply not an issue for the federal judiciary unless a claim is made that an entire practice of legislative prayer has been "exploited to proselytize or advance any one, or to disparage any other, faith or belief." Id. at 794-95. No such claim has been made here. Thus, by adopting the framework outlined above, the majority ignores the Supreme Court's directive and effectively opens the door to future judicial review of legislative prayers[4] outside the narrow confines outlined in Marsh.

Additionally, the majority's analytical framework simply does not do what it purports to do, i.e., ferret out evidence of motive. The fact a reviewing court concludes a tendered prayer is or is not "constitutionally acceptable" says nothing about the motivations of the legislative body that actually rejected the prayer. Indeed, it is entirely conceivable that what turns out to be a "constitutionally unacceptable" prayer could have been rejected by a legislative body based solely on its distaste for the proposed speaker's religious beliefs. On the flip side, if a

---

[4] I use the term "legislative prayers" to refer to prayers given on behalf of a legislative body.

- 12 -

legislative body rejects a proposed prayer solely because of concern for complying with <u>Marsh</u>, the majority would nevertheless apparently infer impermissible motives if it concludes the prayer is "constitutionally acceptable." Both of these examples demonstrate the majority's framework requires absolute perfection on the part of those legislative bodies that attempt to conform their own prayers to the dictates of <u>Marsh</u>.[5] For these reasons, I believe the content of a tendered prayer is, at best, but one piece of evidence pertaining to the issue of motive.

## III.

I would reverse the district court's grant of summary judgment and remand Mr. Snyder's Establishment Clause claim for further proceedings.

SEYMOUR, Chief Judge, joins in the foregoing dissent.

---

[5] I again emphasize that my criticisms are confined to those situations involving prayer by government speakers. Where, as here, we are dealing with private expression, absolute perfection *is* required because a private party's free speech rights are affected by the government's decision. <u>See</u>, <u>e.g.</u>, <u>Pinette</u>, 515 U.S. at 763 (rejection of private expression cannot be based on government's incorrect conclusion concerning potential Establishment Clause problem).

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 10 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

TOM SNYDER,

      Plaintiff - Appellant,

vs.

MURRAY CITY CORPORATION, a
municipal corporation; H. CRAIG
HALL, City Attorney for Murray City
Corporation,

      Defendants - Appellees.

---

UNITED STATES OF AMERICA,

      Intervenor.

No. 96-4087

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 94-CV-667)

---

Brian M. Barnard (Andrea Garland and the Utah Legal Clinic, with him on the
briefs), Cooperating Attorneys for Utah Civil Rights & Liberties Foundation, Inc.,
Salt Lake City, Utah, for Plaintiff-Appellant.

Allan L. Larson (Richard A. Van Wagoner, with him on the brief), Snow,
Christensen & Martineau, Salt Lake City, Utah, for Defendants-Appellees.

---

Before KELLY, HOLLOWAY, and BRISCOE, Circuit Judges.

KELLY, Circuit Judge.

Plaintiff Tom Snyder appeals from the district court's grant of summary judgment in favor of Defendants Murray City and H. Craig Hall, the City Attorney of Murray City. In his 42 U.S.C. § 1983 action, Mr. Snyder alleged that Murray City's refusal to permit him to speak during the reverence portion of a Murray City Council meeting violated his rights under the United States Constitution. He also alleged violations of the Religious Freedom Restoration Act and the Utah Constitution. The talk Mr. Snyder desired to present—which he characterizes as a prayer and the City characterizes as a diatribe against City officials[1]—requests the "Mother in Heaven" to cause the cessation of prayers at public meetings. We exercise jurisdiction under 28 U.S.C. § 1291, and affirm in part and reverse in part.

---

[1] We recognize that the parties disagree over whether Mr. Snyder's proposed speech was a prayer and whether Murray City denied his request. The City's letter to Mr. Snyder informed him that, until his "proposed prayer satisfies [the City's] guidelines, an invitation to participate in our opening ceremonies will not be forthcoming." The City also advised Mr. Snyder that he could request a place on the meeting agenda or voice his thoughts during the citizen comment portion of the meeting. For ease of reference, however, we adopt the terminology used by the parties and refer to Mr. Snyder's talk as a prayer and the City's action as a denial of his request to deliver his prayer.

<u>Background</u>

Since 1982, Murray City has opened its city council meetings with a reverence period, during which an invocation or devotional is presented. The reverence portion of the meetings is designed to encourage lofty thoughts, promote civility, and cause the participants to set aside other matters in order to focus on the topics to be addressed at the meeting. The city council extends invitations to speak during the reverence period to individuals representing a broad cross-section of religious faiths, and invocations or devotionals have been presented at the Murray City Council meetings by Christians, Navajos, Quakers, and Zen Buddhists. One speaker simply requested a moment of silence. Mr. Snyder, who does not reside in Murray City, wrote to the City, advising of his interest in presenting a prayer at a council meeting. Mr. Snyder attached his two-page proposed "Opening Prayer" to the letter.[2] Mr. Snyder's request was part of

---

[2] Mr. Snyder's proposed prayer read as follows:

OUR MOTHER, who art in heaven (if, indeed there is a heaven and if there is a God that takes a woman's form) hallowed be thy name, we ask for thy blessing for and guidance of those that will participate in this meeting and for those mortals that govern the state of Utah;

We fervently ask that you guide the leaders of this city, Salt Lake County and the State of Utah so that they may see the wisdom of separating church and state and so that they will never again perform demeaning religious ceremonies as part of official government functions;

(continued...)

his personal campaign to stop prayers at public meetings, waged in response to a recent decision of the Supreme Court of Utah which upheld Salt Lake City's practice of opening public meetings with a prayer.

Although Mr. Snyder was reared as a member of the Church of Jesus Christ of Latter-Day Saints, he is no longer a practicing member of that faith, or any

---

[2](...continued)
      We pray that you prevent self-righteous politicians from mis-using the name of God in conducting government meetings; and, that you lead them away from the hypocritical and blasphemous deception of the public, attempting to make the people believe that bureaucrats' decisions and actions have thy stamp of approval if prayers are offered at the beginning of government meetings;

      We ask that you grant Utah's leaders and politicians enough courage and discernment to understand that religion is a private matter between every individual and his or her deity; we beseech thee to educate government leaders that religious beliefs should not be broadcast and revealed for the purpose of impressing others; we pray that you strike down those that mis-use your name and those that cheapen the institution of prayer by using it for their own selfish political gains;

      We ask that the people of the State of Utah will some day learn the wisdom of the separation of church and state; we ask that you will teach the people of Utah that government should not participate in religion; we pray that you smite those government officials that would attempt to censor or control prayers made by anyone to you or to any other of our Gods;

      We ask that you deliver us from the evil of forced religious worship now sought to be imposed upon the people of the State of Utah by the actions of mis-guided, weak and stupid politicians, who abuse power in their own self-righteousness;

      All of this we ask in thy name and in the name of thy son (if in fact you had a son that visited earth) for the eternal betterment of all of us who populate the Great State of Utah.

      Amen.

other organized religion. He testified that he considers himself deeply religious, but is not yet sure what his beliefs are, and leans towards agnosticism. Mr. Snyder cites the Book of Mormon and the Gospel of St. Matthew as the religious bases for his prayer. He believes that prayer should be a private matter between an individual and his or her God, and that Jesus Christ opposed public prayers, including those before government meetings. Although Mr. Snyder testified at his deposition that he believes in God, he also testified that he questions God's existence.

On behalf of Murray City, Mr. Hall responded to Mr. Snyder's request and informed him that his proposed prayer was unacceptable because it did not follow the guidelines for prayers which the City had previously provided to Mr. Snyder. Although the council had no formal, written policy, Mr. Snyder had been informed by letter prior to the submission of his proposed prayer that "the purpose of the 'prayer' is to allow individuals [the] opportunity to express thoughts, leave blessings, etc. It is not a time to express political views, attack city policies or practices or mock city practices or policies." Mr. Snyder had also been advised that comments on City practices and policies could be made during city council meetings either by requesting a place on the meeting agenda or by speaking during the citizen comment portion of the meeting. The citizen comment portion of the meeting immediately follows the reverence portion.

Mr. Snyder filed this § 1983 action upon receiving in the mail Murray City's denial of his request to give a prayer. He alleges that the City's refusal of his request violated his rights under the United States and Utah Constitutions to free exercise of his religion and to due process. Mr. Snyder also alleges violations of the Establishment Clause of both Constitutions, and the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb-2000bb-4. Both Defendants and Mr. Snyder moved for summary judgment, which the district court granted in favor of the Defendants and denied to Mr. Snyder, who brings this appeal.

## Discussion

Our review of questions of constitutional law and dispositions on summary judgment is de novo. United States v. One Parcel Property, 106 F.3d 336, 338 (10th Cir. 1997).

### I. Claims Under the United States Constitution

Mr. Snyder brings this action under 42 U.S.C. § 1983. To prevail in a § 1983 claim, a plaintiff must establish that the defendants, while acting under color of state law, deprived him of a right, privilege, or immunity secured by the United States Constitution. We therefore consider whether Murray City's denial of Mr. Snyder's request to deliver his proposed prayer during the reverence

portion of a city council meeting violated his rights under the Free Exercise, Establishment, or Due Process Clauses of the Federal Constitution.

In his briefs, Mr. Snyder relies upon case law interpreting the Free Speech Clause of the First Amendment. Since he did not allege a violation of his right to free speech, however, we need not consider the arguments raised under that body of law.

## A. Free Exercise Claim

The first questions in any free exercise claim are whether the plaintiff's beliefs are religious in nature, and whether those religious beliefs are sincerely held. United States v. Seeger, 380 U.S. 163, 185 (1964). Only beliefs which are religious in nature are protected by the Free Exercise Clause. Nevertheless, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." Thomas v. Review Bd. of the Ind. Employment Sec. Div., 450 U.S. 707, 714 (1981).

Although Mr. Snyder swore out affidavits attesting to his sincerity, the district court held that he was not sincere in the beliefs espoused in his proposed prayer. The district court reached this conclusion based upon the text of Mr. Snyder's prayer, which the court found to contain political instead of religious content, and on Mr. Snyder's deposition testimony that he was unsure of his religious beliefs. The inquiry into the sincerity of a free-exercise plaintiff's

religious beliefs is almost exclusively a credibility assessment, see Seeger, 380 U.S. at 186; Mosier v. Maynard, 937 F.2d 1521, 1526 (10th Cir. 1991), and therefore the issue of sincerity can rarely be determined on summary judgment. This may well be, however, one of those very rare cases in which the plaintiff's beliefs are "so bizarre, so clearly nonreligious in motivation" that they are not entitled to First Amendment protection. Thomas, 450 U.S. at 715.

Regardless, we need not decide whether Mr. Snyder's beliefs are religious in nature nor whether they are sincerely held. Nor need we address Mr. Snyder's argument that summary judgment was inappropriate. Even assuming that Mr. Snyder is possessed of sincerely held religious beliefs, as articulated in his proposed prayer, we find that Mr. Snyder's claim is not cognizable under the Free Exercise Clause. In fact, Mr. Snyder's arguments evince a fundamental misconception about the rights bestowed by the Clause.

The Free Exercise Clause is one of the Bill of Rights's "thou shall not" prohibitions against certain government actions. The Clause "is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government." Sherbert v. Verner, 374 U.S. 398, 412 (1963) (Douglas, J., concurring). To protect "the right to believe and profess whatever religious doctrine one desires," Employment Div. v. Smith, 494 U.S. 872, 877 (1990), the Free Exercise Clause prohibits the government from

impermissibly burdening an individual's free exercise of religion. However, "[t]he Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." Bowen v. Roy, 476 U.S. 693, 699 (1986).

The Free Exercise Clause does not guarantee any person the right to pray whenever and wherever he chooses. Nor does the Clause guarantee a person the right to speak during portions of public meetings set aside for devotional or invocational purposes. Suggestion to the contrary is inconsistent with both common sense and constitutional doctrine. Cf. Heffron v. International Soc'y for Krishna Consciousness, 452 U.S. 640, 647 (1981) ("[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired."). We find no violation of the Free Exercise Clause.

### B. Establishment Clause Claim

Mr. Snyder claims that Murray City's denial of his request to speak at the reverence portion of its city council meeting violated the Establishment Clause. This argument also misapprehends the protections afforded by that Clause. The Establishment Clause assures that the government will not favor a particular religion, nor religion over nonreligion. Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet, 512 U.S. 687, 703 (1994). Like the Free Exercise Clause,

the Establishment Clause is a prohibition against certain government actions. The Establishment Clause does not give any individual the right to establish his religion by guaranteeing an opportunity to pray during public meetings, and certainly does not require Murray City to permit all comers to speak during the reverence portion of its city council meetings.

In Marsh v. Chambers, 463 U.S. 783 (1983), the Supreme Court upheld the constitutionality of opening governmental meetings with prayers. The Court observed that the "opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country." Id. at 786. "To invoke Divine guidance on a public body entrusted with making the laws is not . . . an 'establishment' of religion or a step toward establishment . . . ." Id. at 792.

Mr. Snyder does not argue that Murray City's practice of opening its city council meetings with prayer violates the Establishment Clause. Marsh appears to foreclose such an argument. Instead, Mr. Snyder argues that Murray City violated the Establishment Clause by permitting others to pray, yet denying him the same opportunity. Marsh suggests that a governmental body's practices in selecting persons to deliver prayers at public meetings may violate the Establishment Clause if the selections are the product of impermissible motives. Id. at 793. The record in this matter is devoid of evidence suggesting that Murray City had

impermissible motives either in extending invitations to speak, or in denying Mr.

Snyder's request.[3]  Similarly absent is any suggestion that Murray City used the

reverence portion of its city council meetings to advance a particular faith or to

disparage any faith or belief.  See id. at 794-95.  In contrast, Mr. Snyder's prayer

itself disparages those who believe in the propriety of public prayer.  Clearly, the

content of Mr. Snyder's prayer is in conflict with the City's legitimate objectives

in presenting such prayers.  Marsh controls the issue before us, and we find no

violation of the Establishment Clause.

## C.  Due Process Claim

Because Mr. Snyder's First Amendment claims are without merit, his claim

under the Federal Due Process Clause also fails.  It is beyond argument that

---

[3]        Conceding that no actual evidence of improper motive exists, the dissent attempts to create a material issue of fact sufficient to justify a trial by citing a collection of supposed inferences.  Dissent at 9-10.  A mere demonstration that the City denied Mr. Snyder's request because of the content of his prayer does not prove a violation of the Establishment Clause.  To survive the motion for summary judgment, Mr. Snyder was required to produce evidence from which reasonable jurors could find by a preponderance of the evidence that the City had an impermissible motive, Anderson v. Liberty Lobby, 477 U.S. 242, 252 (1986); in other words, that the City denied Mr. Snyder's request because it preferred another religion, or nonreligion, over his religion.  Genuine issues of material facts may be founded upon inferences; however, those inferences must be reasonable inferences, and must amount to more than a scintilla of evidence.  Id.; see also Black v. Baker Oil Tools, 107 F.3d 1457, 1460 (10th Cir. 1997).  Even assuming that a collection of inferences can create a genuine issue of material fact, this record cannot reasonably be considered to have created such an issue.

process is due only when the government terminates a protected interest. <u>Board of Regents v. Roth</u>, 408 U.S. 564, 569 (1972). Mr. Snyder was not deprived of any protected interest and therefore he had no entitlement to any sort of process.

## II. Religious Freedom Restoration Act Claim

Mr. Snyder appeals from the district court's adverse decision on his RFRA claims. Since this case was argued, however, the Supreme Court has held RFRA unconstitutional. <u>City of Boerne v. Flores</u>, 117 S. Ct. 2157 (1997). We therefore need not consider the merits of Mr. Snyder's RFRA claims.

## III. Claims Under the Utah Constitution

Mr. Snyder also alleges that the City's denial of his request violates the Free Exercise, Establishment, and Due Process Clauses of the Utah Constitution. Although the district court did not reach the merits of these state-law claims, it ruled against Mr. Snyder, finding that the provisions of the Utah Constitution were not "self-executing" and therefore did not provide a cause of action.

We have held that when federal claims are resolved prior to trial, the district court should usually decline to exercise jurisdiction over pendent state law claims and allow the plaintiff to pursue them in state court. <u>See</u> <u>Ball v. Renner</u>, 54 F.3d 664, 669 (10th Cir. 1995). We believe this general practice is particularly appropriate in this case.

- 12 -

The Supreme Court of Utah recently rejected a challenge to Salt Lake City's practice of opening its city council meetings with a prayer. Society of Separationists v. Whitehead, 870 P.2d 916 (Utah 1993). While that challenge was brought under the provision of Utah's Constitution which prohibited the expenditure of public monies for religious purposes and not under its Free Exercise or Establishment Clauses, the Supreme Court of Utah stated in Society of Separationists that it would not follow federal constitutional models in interpreting the Religion Clauses of the Utah Constitution. Id. at 930, 931 n.36. Given that the interpretation of those Clauses appears to be undergoing an evolution, and given the complex issues of state law presented, we decline to exercise supplemental jurisdiction over Mr. Snyder's state-law claims.

We therefore reverse as to the state-law claims and remand them to the district court with instructions to dismiss without prejudice.

AFFIRMED in part, REVERSED in part, and REMANDED to the district court.

**No. 96-4087, <u>Snyder v. Murray City Corporation</u>**

Briscoe, Circuit Judge, concurring and dissenting:

## Federal Free Exercise Claim

I concur with the majority's conclusion that Snyder failed to establish a federal free exercise claim. I agree that the Free Exercise Clause did not guarantee Snyder the right to give his prayer as the opening prayer at city council meetings, and that by excluding Snyder's prayer the City did not impermissibly burden Snyder's right to believe and profess his religious doctrines. His claim is not cognizable under the Free Exercise Clause.

However, I disagree with any suggestion that Snyder's claim could be rejected at the summary judgment stage on the ground that his beliefs are not religious in nature. In reviewing the grant of summary judgment, we examine the factual record and reasonable inferences drawn from it in the light most favorable to the party opposing summary judgment. <u>Kaul v. Stephan</u>, 83 F.3d 1208, 1212 (10th Cir. 1996). The record contains evidence that the beliefs expressed in Snyder's prayer have a religious basis, and whether religious beliefs are sincerely held is a question of fact. <u>Mosier v. Maynard</u>, 937 F.2d 1521, 1523 (10th Cir. 1991). <u>See</u> <u>United States v. Seeger</u>, 380 U.S. 163, 176 (1965). The record does not support a conclusion that the beliefs expressed by Snyder are so bizarre or so clearly nonreligious in nature that the district court could properly resolve the issue on summary judgment.

**Religious Freedom Restoration Act Claim**

I concur with the majority's conclusion that after <u>City of Boerne v. Flores</u>, 117 S. Ct. 2157 (1997), we need not consider the merits of Snyder's Religious Freedom Restoration Act claim. The Court held in <u>Boerne</u> that RFRA's restrictions on state and local government actions affecting religion are unconstitutional.

**Claims under Utah Constitution**

I also concur with the majority's conclusion that it was an abuse of discretion for the district court to exercise supplemental jurisdiction to decide the delicate state constitutional issues. We cannot predict from <u>Society of Separationists, Inc. v. Whitehead</u>, 870 P.2d 916 (Utah 1993), how the Utah Supreme court would decide the state constitutional issues in this case.

**Federal Establishment Clause Claim**

I respectfully dissent from the majority's conclusion that Snyder's federal Establishment Clause claim is precluded by <u>Marsh v. Chambers</u>, 463 U.S. 783 (1983). There are significant differences between this case and <u>Marsh</u>. The sole issue in <u>Marsh</u> was whether the Nebraska Legislature's practice of opening each day's session with a prayer by a chaplain paid by the state violated the Establishment Clause. Using a purely historical analysis, the Court concluded the practice did not establish religion in violation of the First Amendment. The Court

reasoned the practice did not establish religion within the meaning of the First Amendment because the First Congress that drafted the Bill of Rights hired chaplains to give prayers at sessions of Congress. The practice of opening legislative sessions with prayer by a chaplain paid by the government is not an establishment of religion within the meaning of the First Amendment, but "is simply a tolerable acknowledgment of beliefs widely held among the people of this country." 463 U.S. at 792.

Here, the City did not hire or appoint a chaplain as its official religious spokesperson, which was the sole practice at issue in Marsh. Instead, the City sponsored a forum for private individuals to engage in prayer at city council meetings and excluded Snyder from that forum because of the content of his prayer. Snyder does not challenge the City's practice of sponsoring prayer at its council meetings. He challenges only his exclusion from the City-sponsored forum for prayer based on the unacceptable content of his proposed prayer.

Marsh is distinguishable from this case for three reasons. First, the historical record does not support censorship of prayer by private individuals at the start of government meetings. Second, prayer by private individuals at the start of meetings of governmental bodies is fundamentally different from prayer by a chaplain who is appointed as the official paid religious spokesperson for the

governmental body. Third, the record contains circumstantial evidence that the City had impermissible motives for excluding Snyder's prayer.

Although from Marsh we know the members of the First Congress who drafted the First Amendment believed appointment of chaplains did not violate the Establishment Clause, we simply do not know what they would have thought about censorship of prayer at a government-sponsored forum for prayer by individuals at the start of meetings of a legislative body. The censorship of chaplains' prayers at government meetings does not find support in the actions of the First Congress. Research reveals no historical record of the prayers offered by the chaplains of the First Congress. The record of debates and proceedings in the first eighteen congresses in the Annals of Congress do not include chaplains' prayers[1] and, other than the decision of the First Congress to appoint two chaplains of different denominations, one by each house to interchange weekly, *see* 1 Annals of Congress 968, 1077, 1773, there appears to be no record of the measures, if any, taken by Congress to control the content of such prayers.

Marsh suggests that chaplains' prayers could be censored without violating the Constitution. The Court suggested that to be lawful, a legislative chaplain's prayer must be nonsectarian and non-proselytizing:

---

[1] Nor does the Congressional Globe, which covers the mid-19th century. The opening prayers of congressional chaplains were not recorded in the Congressional Record from its start in 1873 until the early twentieth century.

> The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer.

463 U.S. at 794-95.

Conversely, the content of sectarian, proselytizing prayer by a legislative chaplain would be of concern to the courts as a possible establishment of religion. See County of Allegheny v. American Civil Liberties Union, 492 U.S. 573, 603 (1989). Such prayer by a legislative body's official religious spokesperson could reasonably be viewed as governmental endorsement of a particular religion in violation of the Establishment Clause. Consequently, it may not violate the Establishment Clause for a government official to determine whether a chaplain's prayers are sufficiently nonsectarian and nonproselytizing in order to avoid violating the Establishment Clause. Censorship or control of the content of a legislative chaplain's prayers could be justified only by the need to avoid violating the Establishment Clause by keeping the prayers within the limits allowed by Marsh.

It is true Snyder's proposed prayer was proselytizing in nature because it was intended to convert listeners to his point of view on the impropriety of prayer at a governmental function. It is also true that although Snyder was not a member of any organized religious sect, his prayer was sectarian in the sense that it

-5-

represented his particular beliefs and did not attempt to encompass shared beliefs. However, Snyder is not a chaplain hired or appointed to be the City's official religious spokesperson. The prayers at the start of the city council meetings are not offered by a chaplain, but by members of the public representing a broad range of religious beliefs. The Establishment Clause's guarantee of government neutrality toward religion is not offended, but respected, when the government, following neutral criteria and evenhanded policies, gives access to a forum to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse. See Rosenberger v. Rector and Visitors of the University of Virginia, 515 U.S. 819, 115 S. Ct. 2510, 2521 (1995). See also Board of Education v. Mergens, 496 U.S. 226, 248-49 (1990); Widmar v. Vincent, 454 U.S. 263, 277 (1981). If the City permitted Snyder to offer his prayer, a reasonable observer aware of the City's practice of inviting persons representing a broad range of religious and nonreligious viewpoints to give invocations would not regard Snyder's prayer as representing the City's endorsement of his particular beliefs. Consequently, permitting the prayer would not have violated the Establishment Clause. See Rosenberger, 115 S.Ct. at 2523; Capitol Square Review and Advisory Board v. Pinette, 515 U.S. 753, 115 S.Ct. 2440, 2450 (1995); Mergens, 496 U.S. at 2372; see also Capitol Square, 115 S.Ct. at 2455 (O'Connor, J., concurring); County of Allegheny, 492 U.S. at 636 (O'Connor, J.,

concurring). Because permitting Snyder's prayer would not have violated the Establishment Clause, justification for permitting governmental censorship or control of the content of chaplain's prayers suggested by <u>Marsh</u> is not present here.

<u>Marsh</u> also suggests that a governmental body's selection of persons to deliver prayers at its meetings may violate the Establishment Clause if the selections are the product of impermissible motives. I disagree with the majority's conclusion that the record is devoid of evidence suggesting the City had impermissible motives in denying Snyder's request to offer his prayer. I do not, as footnote 3 of the majority opinion asserts, concede there is no *actual* evidence of impermissible motive. There is no *direct* evidence, but there is circumstantial evidence of impermissible motive. Direct evidence of discriminatory intent is rarely available, and it is not a novel proposition to say that intent may be proved by circumstantial evidence. <u>See</u>, <u>e.g.</u>, <u>Denison v. Swaco Geolographic Co.</u>, 941 F.2d 1416, 1420 (10th Cir. 1991). Viewed in the light most favorable to Snyder, the record supports an inference that the guidelines were drafted specifically to exclude Snyder's prayer because its content was offensive.

Snyder wrote to the City in March 1994, expressing interest in presenting a prayer at a council meeting and asking if there were any guidelines or restrictions

on such prayers. Snyder received no reply and wrote again in May, again expressing interest in presenting a prayer and inquiring about any guidelines or restrictions. His request was forwarded to H. Craig Hall, City Attorney of Murray City, who answered Snyder's letter on June 1, 1994.

The City had no formal, written guidelines or restrictions on prayers before council meetings until Snyder asked if there were any. Persons asked to give invocations were simply asked to give an "invocation, appropriate message, or inspirational thought." (Appellant's append. at 281.) According to Hall, since the prayers began in 1982, a custom and practice of "positive, upbeat" prayers "exhorting the City Council to do what they ought to do under their statutory responsibilities" had developed. No one had ever attacked City policies or the council during an invocation.

By the time Snyder made his request, the City Council of Salt Lake City had decided not to have prayer at the opening of council meetings rather than deal with a request by Snyder that he be permitted to deliver a prayer virtually identical to the prayer at issue in this case. Snyder's prayer was likely to offend a great many people of a variety of Christian faiths on religious grounds. The prayer questions the divinity of Jesus and the existence of heaven, and expresses a belief that God may take the form of a woman. These views are controversial, to say the least. Snyder's proposed prayer and the decision of the Salt Lake City

Council were reported in the newspapers. Hall had read newspaper articles about Snyder's request to present the prayer at a Salt Lake City Council meeting, and this knowledge influenced his response to Snyder's request. The record establishes that Hall believed (correctly, as it turned out) Snyder would propose a similar or identical prayer to Murray City, and he drafted his response to exclude the expected prayer. This response constituted the City's first written or unwritten guidelines for prayer at council meetings. In his letter to Snyder, Hall stated that acceptable invocations, inspirational messages, or prayers must not "express political views, attack City policies or practices or mock City practices or policies." (Appellant's append. at 10.) In his deposition, however, he said that not all political views are prohibited; apparently only views critical of the council or its policies and practices.

Upon receiving Hall's response, Snyder sent a copy of his prayer and a request that he be permitted to offer it at a council meeting. On June 30, Hall responded with a letter stating the text of the proposed prayer was "unacceptable" under the guidelines set out in his letter of June 1. (Appellant's append. at 14.) The next month, the City invited the pastor of a local church to deliver an invocation and the invitation made no mention of any guidelines or restrictions.

The record would support inferences that the City had no restrictions on the content of prayers until Snyder made his request, that the restrictions were drafted

specifically to exclude Snyder's prayer, and that the restrictions were not applied to others.  Although there was evidence the City had the permissible motive of promoting civility, and although there was no direct evidence of impermissible motives, the circumstantial evidence is sufficient to support an inference that the City acted to exclude Snyder's prayer because it found the content offensive.  Because the record contains evidence the City acted with impermissible motives, Marsh cannot justify entry of summary judgment for the City.

Because Marsh is not controlling, determining whether the City's exclusion of Snyder based on the content of his prayer violates the Establishment Clause requires further analysis.  The long-standing test for determining whether government action violates the Establishment Clause first set out in Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971), has been modified in recent cases.  Under the Lemon test, government action regarding religion violates the Establishment Clause unless it meets three conditions: (1) It must have a secular purpose; (2) its principal or primary effect must be one that neither advances nor inhibits religion; and (3) it must not foster excessive government entanglement with religion.  The Court has in some cases recast the first and second parts of the Lemon test to ask whether the challenged government action was intended to endorse or disapprove, or has the effect of endorsing or disapproving, religion.  See County of Allegheny, 492 U.S. at 592-93; Lynch v. Donnelly, 465 U.S. 668,

687-94 (1984) (O'Connor, J., concurring); Robinson v. City of Edmond, 68 F.3d 1226, 1229 (10th Cir. 1995), cert. denied 116 S.Ct. 1702 (1996).  In Agostini v. Felton, 117 S. Ct. 1997, 1997 WL 338583 *19-20 (1997), the Court explained that entanglement is properly understood as an aspect of an inquiry into the effect of the government action rather than as a separate factor in the test.

The stated purpose for the City's exclusion of Snyder's prayer was secular-- to promote civility at city council meetings.  However, as discussed above, the record supports an inference that the City drafted its prayer guidelines and applied them only to Snyder because it found the content of his prayer offensive.  On this record, whether the stated purpose was a pretext for impermissible motives is a question of fact.  The exclusion of Snyder's prayer also had the effect of expressing disapproval of his religious views.  A reasonable observer familiar with the City's practices could conclude from exclusion of the prayer that the City disapproved of Snyder's beliefs.  See Chandler v. James, 958 F. Supp. 1550, 1566 (M.D. Ala. 1997).

The City's censorship of the content of the prayer also constitutes excessive entanglement.  Governmental monitoring and control of the content of prayer inevitably establishes religion by entangling the government in religious issues. "[R]eview of prayers by government officials is one of the very practices which the First Amendment was designed to prevent.  The framers knew that

government involvement with one's religious practices would inevitably taint the sanctity of one's faith." Chandler, 958 F. Supp. at 1566 (holding statute permitting student-led, nonsectarian, nonproselytizing prayer in public schools unconstitutional). See also Ingbretsen v. Jackson Public School District, 88 F.3d 274, 279 (5th Cir.), cert. denied 117 S. Ct. 388 (1996). In Lee v. Weisman, 505 U.S. 577 (1992), the Court held prayer at a high school graduation by a clergyman invited by the principal violated the Establishment Clause. The Court did not apply the Lemon or endorsement tests, but focused on the susceptibility of high school students to coercion. However, the Court in effect found excessive entanglement in concluding the principal's control over the content of the prayer offended the Establishment Clause. The Court concluded: "It is a cornerstone principle of our Establishment Clause jurisprudence that 'it is no part of the business of government to compose official prayers for any group of the American people to recite as a part of a religious program carried on by the government,' and that is what the school officials attempted to do." 505 U.S. at 588 (quoting Engel v. Vitale, 370 U.S. 421, 425 (1962)).

Similarly, in Sands v. Morongo Unified School Dist., 809 P.2d 809 (Cal. 1991), cert. denied 505 U.S. 1218 (1992), the court held a school district's attempt to control the content of high school graduation prayers constituted excessive entanglement. To allow preventive monitoring by the state of the content of

-12-

religious speech inevitably leads to gradual official development of what is acceptable public prayer. 'This result is as contrary to the requirements of the Establishment Clause as is . . . composition of an official state prayer.'" 809 P.2d at 818 (quoting Weisman v. Lee, 728 F. Supp. 68, 74 (D.R.I. 1990), aff'd 505 U.S. 577 (1992)).

Courts that have rejected Establishment Clause challenges to state and local legislative prayer have also recognized the risk of excessive entanglement even as they upheld the practice in general. In Bogen v. Doty, 598 F.2d 1110 (8th Cir. 1979), the court rejected an Establishment Clause challenge to a county board's practice of opening meetings with prayer by an unpaid local clergyman. However, the court stated:

> We would be less than candid if we did not warn the county of the quagmire it is near. Up to the time of oral argument, all persons delivering invocations were members of the Christian faith. We have no reason to believe that persons of any religious persuasions have volunteered and been turned down by the board. If in the future this should occur the board will be in a very difficult position to defend against an allegation that it is excessively entangled in religion by giving public approval to some groups while denying it to others.

598 F.2d at 1114. In upholding a statute authorizing the use of public funds to pay salaries of chaplains for the state legislature, the Massachusetts Supreme Court noted:

There is no evidence that a great degree of government entanglement with religion is occasioned by the employment of legislative chaplains. The prayers offered are brief, *the content unsupervised by the State,* and attendance completely voluntary. There is *no evidence that the State has become embroiled in any difficult decisions about which religions are to be represented or what sorts of invocations are to be offered.*

Colo v. Treasurer and Receiver General, 392 N.E.2d 1195, 1200 (Mass. 1979) (emphasis added). See Lincoln v. Page, 241 A.2d 799, 800 (N.H. 1968); Marsa v. Wernik, 430 A.2d 888, 901 (N.J. 1981) (Pashman, J., concurring).

Not all government oversight of religious activities violates the Establishment clause--the entanglement must be excessive. Although mere custodial oversight of religious activities at a government-sponsored forum does not constitute excessive entanglement, see Mergens, 496 U.S. at 253, the censorship of prayer goes far beyond mere custodial oversight, and strikes at the heart of the Establishment Clause. Moreover, if the City applied its guidelines to all prayers at council meetings, the censorship would be regular and frequent. In Lemon, 403 U.S. at 620, the Court held state aid to parochial schools violated the Establishment Clause because of the monitoring required to ensure that teachers paid with public funds did not teach religion. "A comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed and the First Amendment otherwise respected. . . . These prophylactic contacts will involve excessive and enduring entanglement between state and church." Here, if Murray City were to consistently apply its prayer

-14-

guidelines and review all prayers before its meetings, the city attorney would have to censor prayers approximately thirty-six times a year.

I recognize that the invocation ceremony at the start of city council meetings is not a public forum open for indiscriminate public speech by the general public.  It is a limited forum from which the government may exclude a speaker who wishes to address a topic not encompassed within the purpose of the forum, although it cannot exclude a speaker solely to suppress a point of view espoused on an otherwise includible subject.  Cornelius v. NAACP Legal Defense and Educational Fund, Inc, 473 U.S. 788, 806 (1985).  See Rosenberger, 115 S.Ct. at 2516-17; Lamb's Chapel v. Center Moriches Union Free School Dist., 508 U.S. 384, 392-94 (1993). The City limited the forum to speech appropriate for an invocation ceremony.  The stated purpose of the invocation ceremony was to promote civility, solemnize the occasion, and encourage concentration on the matters on the agenda by appropriate inspirational messages, including prayers.  When confronted with a prayer it deemed inappropriate for the invocation, the City drew up guidelines prohibiting prayer expressing political views or attacking or mocking City policies and practices.  Such prayer would not tend to promote civility or solemnize the occasion.

The City could not properly exclude prayer attacking or mocking the city council or its policies and practices unless it also excluded prayer defending or

supporting the council and its policies and practices.  Otherwise, it would be allowing prayer on political matters, but from only one point of view.  The guidelines purported to exclude all prayer expressing political views, but the record indicates some political views were permitted, and the record would support an inference that the City drafted its guidelines specifically to exclude Snyder's religious views.

Moreover, even neutral exclusion of all prayer expressing political views would violate the Establishment Clause.  The City specifically invited religious speech in the form of prayer.  Neutral enforcement of the rule prohibiting prayer expressing political views would entangle the City in religion by requiring censorship of prayer.  It could also convey a message of governmental disapproval of religions whose adherents feel compelled to address political issues.

## Procedural Due Process Claim

Because in my view, the district court erred in entering summary judgment against Snyder's federal Establishment Clause claim, I also dissent from the majority's conclusion that because Snyder was not deprived of any protected interest, his due process claim fails.